Lydia LIBERTAD, et al.,
Plaintiffs–Appellants,

v.

Father Patrick WELCH, et al.,
Defendants–Appellees.

No. 94–1699.

United States Court of Appeals,
First Circuit.

Heard Nov. 8, 1994.

Decided April 28, 1995.

Catherine Albisa, New York City, with whom Judith Berkan, San Juan, PR, was on brief, for appellants.

Mathew D. Staver, with whom Frederick H. Nelson and Nicole M. Arfaras, Orlando, FL, were on brief, for appellees Ed Martin, Donald Treshman and Rescue America.

Miguel A. Giménez–Muñoz and Cordero, Miranda & Pinto, Old San Juan, PR, on brief, for appellees Father Patrick Welch and Norman Weslin.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

TORRUELLA, Chief Judge.

A group of individuals and organizations representing women who have sought or will seek family planning services in Puerto Rico ("Appellants") brought this action against certain individuals and organizations ("Appellees") who oppose abortion and coordinate anti-abortion demonstrations at women's health clinics in Puerto Rico. The Appellants appeal from the district court's grant of summary judgment disposing of their claims brought under §§ 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act, ("RICO"), 18 U.S.C. § 1961 et seq. (1984), and the "hindrance clause" of 42

U.S.C. § 1985(3) (1981).[1] In granting summary judgment for Appellees, the district court ruled: 1) that Appellants' claims brought under §§ 1962(c) and (d) of RICO failed because Appellants did not show either the existence of an enterprise or a pattern of racketeering activity; and 2) that Appellants' claims brought under the "hindrance clause" of the "Ku Klux Klan Act," 42 U.S.C. § 1985(3), failed because Appellants did not show "that the purpose of [Appellees'] alleged conspiracy was to prevent or hinder law enforcement officers from giving or securing to women their right to seek abortions." For the following reasons, we affirm in part and reverse in part.

## I. BACKGROUND

### A. *The Parties*

Appellants initiated this action on behalf of women seeking reproductive health services and their health care providers. Among the named plaintiffs are two women using the pseudonyms "Lydia Libertad" and "Emilia Emancipación." Both Libertad and Emancipación are Puerto Rico residents and have sought reproductive health services on the island. Another plaintiff, Rosa Cáceres, is the Clinic Administrator at the Women's Metropolitan Clinic ("WMC") in Río Piedras, Puerto Rico, which provides a range of reproductive health services including abortion. WMC is owned in turn by plaintiff Oficinas Médicas. Plaintiff Mary Rivera is the Clinic Supervisor and Director of Counselling at the Clínica Gineco–Quirúrgica, ("Clínica") which also provides reproductive health services including abortion. Plaintiffs Ana E. González–Dávila ("González") and Dr. Rafael E. Castro–De Jesús ("Castro") are, respectively, the administrator and the medical director of plaintiff Ladies Medical Center ("LMC"), which also provides reproductive health services including abortion. The Grupo Pro Derechos Reproductivos, an abortion rights organization, is also a plaintiff.

Defendant Father Patrick Welch is the head of the anti-abortion rights organization Pro–Life Rescue Team ("PLRT"), also a

named defendant. Defendants Donald Treshman and Reverend Ed Martin are, respectively, the National Director and the Executive Director of defendant Rescue America, a nationwide anti-abortion rights group based in Houston. Defendant Norman Weslin is the director of the defendant anti-abortion rights group the Sacrificial Lambs of Christ ("SLC"). Defendant Carlos Sánchez is a member of the anti-abortion rights group Pro–Vida.

### B. *Events Leading to this Action*

We present the facts here in the light most favorable to the Appellants. *See Maldonado–Denis v. Castillo–Rodríguez*, 23 F.3d 576, 581 (1st Cir.1994) (when reviewing grant of summary judgment, record is examined in light most favorable to nonmovant). Some or all of the Appellees staged protest demonstrations, which they refer to as "rescues," at the plaintiff clinics on five occasions: September 26, 1992, September 28, 1992, December 17, 1992, December 24, 1992, and January 8, 1993. During each of the five protests, Appellees blockaded the clinics so that clinic personnel and patients could not enter. Each blockade was carried out in a similar manner. Typically, the protests began before the clinics opened, with Appellees blocking access to the clinics and parking lots by physically obstructing the entrances, linking their arms tightly together and refusing to allow anyone to pass through. Outside, the protesters shouted slogans through megaphones to clinic personnel and patients, told patients that they were "murderers," screamed insults at clinic personnel, and videotaped or photographed people as they attempted to enter and leave the clinics. The protesters also defaced the clinic property by affixing difficult-to-remove stickers depicting fetuses on the walls and entrances, and by scrawling graffiti on the clinic walls. During these blockades, litter was strewn around clinic property and on the properties of surrounding businesses. In addition to effectively shutting down the clinics for all or

---

**1.** Appellants also brought several pendant state law claims for negligence, nuisance, and illegal use of amplifiers and loudspeakers, which the district court dismissed without prejudice. Those claims are not before us.

part of a day, these protests caused extensive and costly property damage to the clinics.

Appellee Welch and some of the minor children who protest with him have on occasion entered the clinics and intimidated or harassed patients and staff. On September 26, 1992, Welch invaded the LMC and pushed plaintiff González from the clinic entrance all the way through the waiting room to the back office, trapping her there for a number of hours. On September 28, 1992, Welch and a young girl entered one of the clinics and remained in the waiting room, despite being told to leave by clinic staff. Patients with appointments would enter and then leave when they recognized Welch in the waiting room. Eventually, the police had to come and remove Welch and the young girl.

The record indicates that of the five protests at issue in this case, the January 8, 1993 protest is the only one at which all of the Appellees, not just Welch and his followers, participated. The tactics employed on January 8 were considerably more aggressive. In addition to the above-mentioned blockade methods, Appellees also blocked clinic access by parking buses in front of clinic entrances and then refusing to move them when instructed to do so by the police. Appellees chain-locked a clinic entrance and then covered the lock with tape to prevent it from being pried open. One clinic supporter received a death threat from a protester. The clinic suffered considerable property damage as well; locks were filled with glue or gum, and gates were broken or otherwise damaged to prevent entry.

When the police attempted to arrest protesters on January 8, many protesters climbed under the motor vehicles to avoid arrest. Demonstrators also used other delay tactics, such as going limp when police arrested them, or lying down on the ground and locking arms, thus making it nearly impossible for the officers to physically remove them from the clinic property. The evidence also indicates that some protesters actively resisted arrest by assaulting officers, or by flailing their arms to make the officer's task more difficult and time-consuming. At one blockade, protesters poured acid in a police van in which several arrestees were held, necessitating that they be taken out of the van and further delaying the police.

The blockades demand that local law enforcement officials expend a significant amount of time and resources; between forty-five and sixty officers are usually deployed for each protest. Law enforcement officials testified that they are overwhelmed by the protesters' tactics, that they are unable to either deter the blockades or keep the clinics open during the blockades.

Some Appellees explained during depositions and at the hearing that one reason for these tactics is to "buy time" for the "unborn"—i.e., to delay their arrests, thereby prolonging the blockade of the clinic and delaying or preventing the clinic from resuming its business, particularly the performance of abortions.

## C. Procedural History

On January 8, 1993, Appellants filed the instant action seeking a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining Appellees from using unlawful force, harassment, intimidation, and physical obstruction during their protests in front of Puerto Rico clinics. The district court denied the motion for a temporary restraining order, but held a hearing from February 4–9, 1993 on Appellants' request for a preliminary injunction, during which extensive testimonial and documentary evidence was presented by both parties.

On February 9, 1993, during the hearing, Appellees' counsel moved for dismissal of the complaint as to defendants SLC and Rescue America on the grounds of defective service of process.[2] The court examined the record and found that service on these defendants was defective because the summons failed to state the name of the person served. The court attempted to have the U.S. Marshal who had served the summons called into

---

**2.** Significantly, counsel for SLC and Rescue America was present at the hearing, as well as all other court proceedings, and made a general appearance in the case, rather than a special limited appearance to contest proper service.

court to testify, but the Marshal was unavailable. The court did not rule at that time on the defective service of process issue, but advised Appellants' counsel to "inquire" about the problem. At the hearing's close, the court ordered the parties to submit post-hearing briefs.

On November 1, 1993, the district court denied the preliminary injunction, ruling that Appellants had not demonstrated a reasonable likelihood of success on the merits of their complaint, and that there existed no genuine dispute of material facts. The court converted the Appellees' motions to dismiss into motions for summary judgment pursuant to Fed.R.Civ.P. 12(c), and ordered Appellants to show cause why summary judgment should not be entered. Accordingly, on December 30, 1993, Appellants filed their opposition to summary judgment accompanied by a statement alleging disputed material facts.

In March of 1994, responding to perceived threats by Appellees to begin another round of blockades and protests, Appellants filed a motion renewing their request for injunctive relief. On May 3, 1994, the court denied this request, and granted summary judgment in Appellees' favor. Specifically, the court held 1) that Appellants' claims brought under §§ 1962(c) and (d) of RICO failed because Appellants did not show either the existence of an enterprise or a pattern of racketeering activity; and 2) that Appellants' claims brought under the "hindrance clause" of 42 U.S.C. § 1985(3) failed because Appellants did not show "that the purpose of [Appellees'] alleged conspiracy was to prevent or hinder law enforcement officers from giving or securing to women their right to seek abortions." In the same order, the court dismissed the claims against Rescue America and SLC on the grounds of defective service of process.

## II. PRELIMINARY DISCUSSION

### A. *Standard of Review*

■ Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We review a grant of summary judgment *de novo*, examining the entire record in the light most favorable to the nonmovant and indulging all reasonable inferences in that party's favor. *Maldonado–Denis*, 23 F.3d at 581 (citations omitted); *Pagano v. Frank*, 983 F.2d 343, 348 (1st Cir.1993).

■ The movant must aver an "absence of evidence to support the nonmoving party's case." The burden then shifts to the nonmovant, the party opposing summary judgment, to establish the existence of at least one fact issue which is both "genuine" and "material." *Maldonado–Denis*, 23 F.3d at 581 (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (other citations omitted)). A "genuine" issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either party. *Id.* In other words, a genuine issue exists "if there is 'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" *Id.* (quoting *Garside*, 895 F.2d at 48). A "material" issue is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ The nonmovant may not defeat a properly supported motion for summary judgment by relying upon mere allegations or evidence that is less than significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11. Rather, the nonmovant must present definite, competent evidence to rebut the motion. *Maldonado–Denis*, 23 F.3d at 581.

### B. *Standing*

■ During oral argument, Appellees' counsel raised for the first time in this case the issue of Appellants' standing to bring their claims. Because standing is a jurisdictional requirement which remains open to review at all stages of litigation, *National Org. for Women v. Scheidler*, —— U.S. ——, ——, 114 S.Ct. 798, 802, 127 L.Ed.2d 99 (1994), we ordered the parties to submit supplemental briefs on the question.

If a plaintiff lacks standing to bring a matter before a court, the court lacks jurisdiction to decide the merits of the underlying case. *United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir.1992). Thus, standing is a threshold issue, determining whether the court has the power to hear the case, and whether the putative plaintiff is entitled to have the court decide the merits of the case. *Id.* The inquiry into a plaintiff's standing "involves a blend of constitutional requirements and prudential considerations." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982).

There are three irreducible, minimum constitutional elements of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). First, a plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Id.* (footnote and internal quotations omitted). Second, there must be a causal connection between the injury and the conduct complained of, such that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court. *Id.* Finally, it must be likely, and not merely speculative, that the injury will be redressed by a favorable decision. *Id.*

To establish these elements of standing at the summary judgment stage of a proceeding, a plaintiff cannot rest on mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true. *Id.* at 561–62, 112 S.Ct. at 2137.

In addition to these constitutionally required elements, the doctrine of standing also involves prudential considerations. Specifically, a court must determine 1) whether a plaintiff's complaint falls within the zone of interests protected by the law invoked; 2) whether the plaintiff is asserting its own rights and interests, and not those of third parties;[3] and 3) that the plaintiff is not asking the court to adjudicate abstract questions of wide public significance which amount to generalized grievances more appropriately addressed by the legislature. *AVX Corp.*, 962 F.2d at 114 (citations omitted).

Finally, the Supreme Court has stated that a RICO plaintiff seeking to invoke a court's jurisdiction must also establish that she has been injured in her business or property by the conduct allegedly constituting the RICO violation. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). With these principles in mind, we address whether the Appellants have standing as to each claim.

### 1. Appellants' standing to bring a RICO claim

Appellees first contend that Appellants lack standing to assert claims under §§ 1962(c) and (d) of RICO. Specifically, they argue that Libertad, Emancipación, and Grupo Pro Derechos Reproductivos ("Grupo Pro Derechos") lack standing to bring a RICO claim because they suffered no injury to business or property. Second, Appellees argue that the three clinics and González, Cáceres, and Castro lack standing under RICO because they have failed to show that Appellees' actions proximately caused them any injury.

### a. Do Libertad and Emancipación have standing?

Libertad and Emancipación are women who have sought reproductive health services at the blockaded clinics. Libertad submitted a sworn statement in support of Appellants' opposition to summary judgment, in which she described her experience at the WMC. She stated that the anti-abortion protesters intimidated her and made her angry; however, the protesters did not prevent her from attending her appointment at the clinic and obtaining an abortion.

---

**3.** An exception to this general rule is that associations may assert the claims of their members in certain circumstances, discussed below.

Emancipación testified at the summary judgment hearing about her experience at the blockaded clinic. Unlike Libertad, Emancipación was intimidated enough by the Appellees' blockade and protest tactics that she was deterred from entering the clinic for her appointment. Emancipación eventually returned to the clinic on a different day, however, and there is no indication that the delay caused her any physical harm.

Although we acknowledge that both women reasonably felt intimidated and harassed, neither woman suffered any injury to business or property, as is required for standing to sue under RICO. We therefore hold that Libertad and Emancipación do not have standing to maintain this RICO claim.

### b. Does the Grupo Pro Derechos have standing?

Appellant Grupo Pro Derechos is an association of feminist and human rights organizations and individuals. The group's mission is to defend women's reproductive rights, and to work for quality women's health services, sex education, and family planning. It allocates some of its resources to providing protection for women who patronize a blockaded clinic, and sues on its own behalf and on behalf of its members.

We have combed through the voluminous record and have been unable to find any

evidence, or even any specific allegation, that the Grupo Pro Derechos has sustained any injury to business or property as a result of Appellees' conduct. One of the organization's members, Ms. Nancy Herzig Shannon, testified that while at one of the blockaded clinics, she received a death threat from a protester. She is not herself a named plaintiff, however, and she did not testify about any injury sustained by the group, such as expended resources, property damage, foregone business activities, or extortionate threats to its general membership. While the conduct of the protesters, lawful and unlawful, certainly conflicts with the group's mission and renders their objectives more difficult to achieve, this by itself does not give rise to an injury to the group's business or property interests. We therefore hold that the Grupo Pro Derechos does not have standing to maintain this RICO cause of action.[4]

### c. Do the remaining Appellants have standing?

Appellees claim that the remaining Appellants, the three clinics and their directors or administrators, lack standing to bring the RICO claim because they have failed to show that Appellees' acts proximately caused them injury.[5] Even a cursory review of the record, particularly of the testimony adduced at the summary judgment

4. Plaintiffs like Libertad and Emancipación could have standing to sue under RICO, if they were to submit sufficient evidence of injury to business or property such as lost wages or travel expenses, actual physical harm, or specific property damage sustained as a result of a RICO defendant's actions. The record before us, however, does not sufficiently establish this required element. Similarly, it is not impossible for unincorporated groups and organizations to have standing under RICO, if the group could meet the tests for associational or representational standing, see, e.g., Pennell v. City of San José, 485 U.S. 1, 7 n. 3, 108 S.Ct. 849, 855 n. 3, 99 L.Ed.2d 1 (1988), and could sufficiently establish that a RICO defendant's conduct caused it some injury to business or property.

5. Appellees also claim that these Appellants lack standing because they "lack" the necessary two predicate acts. As Appellees point out, to prove a violation of RICO, a plaintiff or plaintiffs must show a minimum of the two necessary "predicate acts" which allegedly constitute a "pattern

of racketeering activity." See 18 U.S.C. § 1961(5). Appellees contend that because the record shows the WMC and LMC clinics were the targets of only one blockade each, neither of them can sue under RICO.

This argument simply has no merit. An analysis of a plaintiff's standing focuses not on the claim itself, but on the party bringing the challenge; whether a plaintiff's complaint could survive on its merits is irrelevant to the standing inquiry. Family & Children's Ctr. v. School City of Mishawaka, 13 F.3d 1052, 1058 (7th Cir. 1994); see also Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir.1993) ("Our standing inquiry depends on whether the plaintiffs have established the existence of a case or controversy ... but does not involve the merits of particular claims."). The "two-act minimum" is a part of the substantive "pattern" element of a RICO cause of action, not a threshold requirement necessary to confer standing. See 18 U.S.C. §§ 1961(5) and 1962; Fleet Credit Corp. v. Sion, 893 F.2d 441, 444 (1990).

hearing, belies this argument. The record is replete with evidence of the extensive property damage caused by Appellees' blockades at the clinics: broken locks, damaged gates, vandalism, strewn litter on the grounds, to list examples. Appellee Welch and his followers also did damage inside the clinics, ripping out electrical sockets and jamming door locks. The blockades also delayed or prevented the clinics from conducting business on those days. We therefore find that Appellants have sufficiently shown injury to business or property, and that this injury was proximately caused by Appellees.

As to the third, "redressibility" element of standing, Appellants seek, among other things, declaratory and injunctive relief from the Appellees' blockade activities—the same activities that caused their injury. This satisfies the "necessary causal connection between the injury alleged and the relief requested," *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 37 (1st Cir.1993), and we therefore find that the remaining Appellants have established the constitutional requirements necessary to confer standing.

Over and above these constitutional requisites, an analysis under the standing doctrine also embraces prudential concerns regarding the proper exercise of the court's jurisdiction. *Vote Choice, Inc.*, 4 F.3d at 37. The remaining Appellants satisfy these concerns. They are asserting their own rights and interests in conducting their lawful business; their grievances are particularized and concrete; and the Appellants fall within the zone of interests contemplated by the explicit terms of the RICO statute—namely, "person[s] injured in [their] business or property" by an alleged pattern of racketeering activity. § 1964(c); *see also, Sedima, S.P.R.L.*, 473 U.S. at 483, 497, 105 S.Ct. at 3278, 3285 (discussing the "far-reaching civil enforcement scheme" established by RICO, and rejecting restrictive readings of the statute's intended scope).

Accordingly, we hold that the remaining Appellants—the clinics, Cáceres, Oficinas, Rivera, González, and Castro—all have standing to maintain this RICO claim.[6]

### 2. *Appellants' standing to maintain a § 1985(3) claim*

Appellees also contend that Appellants lack standing to maintain their claim under

---

Moreover, nowhere in either the text of RICO or the case law is there any suggestion that *each victim* of an alleged pattern of racketeering activity must have suffered at least two predicate acts at the hands of the defendant. In fact, adopting such a requirement would conflict with the statute's purpose and seriously curtail the statute's intended breadth. Under the Appellees' proposed scheme, a *defendant* could avoid RICO liability simply by continually choosing new targets for his unlawful activities, a result that Congress could not have intended. In the instant case, each Appellant clinic was the target of Appellees' unlawful blockades. Each blockade was executed in a similar fashion with exactly the same purpose—to delay or prevent the clinics from opening and providing abortions. Therefore, that the LMC and WMC were only blockaded once each is irrelevant to either their standing under RICO, or to the merits of their claim. It is sufficient that the clinics have been among the targets of Appellees' five blockades.

**6.** Appellees somewhat cryptically claim that Appellants have failed to establish that their injuries were proximately caused by the alleged underlying RICO violation, which in this case is extortion under the Hobbs Act, 18 U.S.C. § 1951(b)(2) (1984). Under this provision, extortion means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." The intangible right to freely conduct one's lawful business constitutes "property" for purposes of this section. *See Northeast Women's Ctr. v. McMonagle*, 868 F.2d 1342, 1350 (3d Cir.), *cert. denied*, 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989).

If Appellees are contending that Appellants have not sufficiently proven the underlying extortion claim, this contention again goes to the substantive merits of Appellants' case, and not to the threshold issue of standing. Moreover, the record clearly shows that Appellees used force (physical obstruction, trespass, vandalism, resisting arrest), intimidation, and harassment of clinic personnel and patients, with the specific, uniform purpose of preventing the clinics from conducting their normal, lawful activities. The record also amply shows that Appellees' tactics include the intentional infliction of property damage, and directly result in the clinics' loss of business. It is difficult to conceive a set of facts that more clearly sets forth extortion as it is defined by § 1951(b)(2). We therefore are satisfied that, for the limited purpose of maintaining their RICO claims, Appellants have sufficiently established that Appellees' blockades constitute extortion, and that the extortionate acts proximately caused injury or damage to Appellants' property.

the hindrance clause of 42 U.S.C. § 1985(3).[7] They argue that claims under the hindrance clause require a showing of 1) a class-based, invidiously discriminatory animus, and 2) the assertion of a right protected against both private, as well as official, encroachment.[8] As we will discuss below, it is not entirely clear that Appellees' interpretation of the hindrance clause's requirements is correct.

In any event, their interpretation is irrelevant to the issue of Appellants' standing to maintain a § 1985(3) hindrance clause claim, because Appellees have once again confused the substantive elements of a cause of action with the threshold requirements necessary to confer standing. Appellants need not establish the elements of their cause of action in order to *sue*, only to *succeed* on the merits. In order to have standing to sue, Appellants must only establish that the constitutional and prudential considerations set forth above are satisfied.

▬ It is clear that Appellants satisfy the requirements for standing. First, for reasons similar to those set forth above, the clinics, Cáceres, Oficinas, Rivera, González, and Castro all have standing. They all have sufficiently established an injury-in-fact, either to their physical plant, their intangible property right to conduct lawful business, or both. They have also sufficiently established that the Appellees' activities proximately caused their injuries, and that the relief they seek here will redress those injuries.

▬ Although Libertad and Emancipación did not allege or establish an injury to business or property sufficient to invoke the court's jurisdiction on their RICO claim, they have established an injury-in-fact sufficient to maintain their § 1985(3) claim. The injury-in-fact requirement "serves to distinguish a person with a direct stake in the outcome of a litigation—*even though small*—from a person with a mere interest in a problem." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412

U.S. 669, 690 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973) (citations omitted) (emphasis added). Therefore, plaintiffs such as Libertad and Emancipación need not establish a particularly damaging injury; they need only show that they were directly affected by the conduct complained of, and therefore have a personal stake in the suit. *See also Adams v. Watson*, 10 F.3d 915, 918 (1st Cir.1993) (noting that the contours of the injury-in-fact requirement are "generous," and that even a slight injury suffices to confer standing). Both Libertad and Emancipación had appointments at, and attempted to enter, one of the blockaded clinics. Both were, therefore, targets of the Appellees' activities which form the basis for the alleged conspiracy in violation of § 1985(3), and both were affected by the alleged conspiracy to a degree sufficient to confer standing.

These Appellants also satisfy the prudential considerations involved in the standing inquiry. First, their claims do not fall outside the reasonable "zone of interests" of § 1985(3), which purports to afford remedial relief to all citizens. *See Bray*, —— U.S. at ——, 113 S.Ct. at 785 (Stevens, J., dissenting) (discussing the statute's legislative history and intended scope). Second, although the Appellants claim to bring this suit in part on behalf of all women in Puerto Rico seeking family planning services, they are also suing on their own behalf and are therefore asserting their own concrete rights or interests. Finally, their claims are not abstract questions or generalized grievances, but instead are sufficiently particularized, such that they may appropriately be addressed by the judiciary. We therefore hold that Libertad, Emancipación, the clinics, Cáceres, Oficinas, Rivera, González, and Castro all have standing to maintain their claim under the hindrance clause of § 1985(3).

▬ The Grupo Pro Derechos is the only Appellant whose standing under § 1985(3) is still in question. Because Grupo Pro Derec-

---

**7.** The hindrance clause of § 1985(3) prohibits a conspiracy "for the purpose of preventing or hindering the constituted authorities ... from giving or securing to all persons ... the equal protection of the law."

**8.** Appellees base their arguments on *Bray v. Alexandria Women's Health Clinic*, —— U.S. ——, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), in which the Supreme Court held that successful claims under the "deprivation" clause of § 1985(3) must establish these elements.

hos is an association whose standing is premised not on injury to itself but to others, we apply the test for "associational standing," which is slightly different than the traditional standing inquiry. It is well settled that an association may sue on behalf of its members when 1) at least one of its members possesses standing to sue in his or her own right; 2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and 3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals. *AVX Corp.,* 962 F.2d at 116 (citations omitted).

■ That Grupo Pro Derechos satisfies the second and third prongs of this analysis is not reasonably subject to debate. The interests of its suit here—to prevent unlawful blockade activities at abortion clinics in Puerto Rico in order to ensure access to family planning services for Puerto Rican women—is not only pertinent to the group's purpose, it *is* its primary purpose. Nor do the group's claims here require that each of its members participate in the suit or in the relief demanded.

The only real issue is whether the Grupo Pro Derechos satisfies the first prong—that is, whether at least one of its members has standing to assert the claims in his or her own right. In the Appellants' amended complaint, the group is described as an association of feminist and human rights organizations and individuals. Among its members is Nancy Herzig Shannon, who testified that she was harassed during one of the blockades, and received a death threat from a protester. This is certainly enough to confer standing on her. Because it is not contested that Herzig is a member of Grupo Pro Derechos and she has standing on her own to sue, we hold that the Grupo Pro Derechos has associational standing to maintain the § 1985(3) claim.

## C. Appellees' claims of defective service of process

■ Appellants contend that the district court erroneously dismissed their claims against SLC and Rescue America due to defective service of process. Specifically, the court found that the service was defective because the summons failed to state the name of the person served. The court's dismissal, claim the Appellants, was based on its incorrect assumption that Appellants had conceded the issue of improper service, and was granted *sua sponte* without affording them an opportunity to defend the service.

In fact, claim the Appellants, all the defendants, including SLC and Rescue America, were personally served by U.S. Marshals, and return of service was filed with the district court. Rescue America and SLC were both served through a proper agent as authorized by Fed.R.Civ.P. 4(h). For Rescue America, the U.S. Marshals served both Treshman, the group's National Director, and Martin, the group's Executive Director. For SLC, the Marshals served Weslin, the group's national director.

We have held that "the root purpose underlying service of process is to ensure that a defendant receives fair notice of the suit and adequate opportunity to protect her interests." *Jardines Bacata, Ltd. v. Díaz–Márquez,* 878 F.2d 1555, 1559 (1st Cir.1989). When an alleged defect in service is due to a minor, technical error, only actual prejudice to the defendant or evidence of a flagrant disregard of the requirements of the rules justifies dismissal. 4A C. Wright and A. Miller, *Federal Practice & Procedure,* Civ.2d § 1088; *Benjamin v. Grosnick,* 999 F.2d 590, 594 (1st Cir.1993) (dismissal for defective service not required where defect in service did not prejudice defendant); *see also, Hobson v. Wilson,* 737 F.2d 1 (D.C.Cir.1984) (dismissal for defective service should be granted only when defendant was prejudiced); *United Food & Comm'l Workers Union Int'l v. Alpha Beta Co.,* 736 F.2d 1371, 1382 (9th Cir.1984) (dismissal is generally not justified absent a showing of prejudice, and defendant's answer and general appearance in action should prevent any technical error from invalidating entire process).

Here, Appellees do not claim that they suffered any prejudice from the minor, technical defect in the summonses, and we do not discern any prejudice. It is clear that at all times during the proceedings, Rescue Amer-

ica and SLC had fair notice of the suit, and adequate opportunity to protect their interests. Both parties' counsel made general appearances at every stage of the proceeding, and had ample opportunity to defend against the Appellants' claims. Dismissing the claims against Rescue America and SLC exalts the form of Rule 4 over its substance and purpose. We therefore find that the district court improperly dismissed the Appellants' claims against Rescue America and SLC on these grounds, and we accordingly reinstate the claims against these Appellees. We may now turn to the substance of Appellants' claims.

### III. ANALYSIS

#### A. *Appellants' RICO claims*

Appellants allege that Appellees have conspired to, and have conducted or participated in the conduct of an enterprise through a pattern of racketeering activities, specifically with intent to extort Appellants' property interest in their business and practice of health care, all in violation of §§ 1962(c) and (d) of RICO.[9]

■■■■ To state a claim under § 1962(c), a plaintiff must allege each of the four elements required by the statute: 1) conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity. *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 41 (1st Cir. 1991) (citing *Sedima, S.P.R.L.*, 473 U.S. at 496, 105 S.Ct. at 3285). For claims under § 1962(d), a plaintiff must show that each defendant in the RICO conspiracy case joined knowingly in the scheme and was involved himself, directly or indirectly, in the commission of at least two predicate acts. *Feinstein*, 942 F.2d at 41 (citations omitted); *see also United States v. Angiulo*, 847 F.2d 956, 964 (1st Cir.) (necessary elements of RICO conspiracy charge are 1) existence of enterprise; 2) that each defendant knowingly joined the enterprise; and 3) that each defendant agreed to commit, or in fact committed, two or more predicate acts as part of his

participation in enterprise), *cert. denied*, 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988).

#### 1. *Have Appellants established an "enterprise"?*

■■■■ The term "enterprise" is defined in the RICO statute as including "any individual, partnership, corporation, association, or other legal entity, *and* any union or group of individuals *associated in fact* although not a legal entity." § 1961(4) (emphasis added). There are, therefore, two types of enterprises: legal entities and associations-in-fact. *United States v. Turkette*, 452 U.S. 576, 580–581, 101 S.Ct. 2524, 2527–28, 69 L.Ed.2d 246 (1981). The Supreme Court has explained that in order to prove a RICO claim, a plaintiff must show both an "enterprise" and a "pattern of racketeering activity." *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528–29. The enterprise is an entity, a group of persons associated for a common purpose of engaging in a course of conduct. The pattern of racketeering activity, on the other hand, is a series of criminal acts as defined by the RICO statute. The former is proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* The latter is proved by "evidence of the requisite number of acts of racketeering committed by the participants in the enterprise." *Id.* While the proof used to establish these separate elements may "coalesce," proof of one does not necessarily establish the other. *Id.* The "enterprise" is not the "pattern of racketeering activity;" it is an entity apart and distinct from the pattern of activity in which it engages. The existence of an enterprise is, therefore, a separate element which must be proven. *Id.*

■■■■ The enterprise need not be a profit-seeking entity, or a victim of unlawful activities. *Scheidler*, —— U.S. at ——, 114 S.Ct. at 804. Rather, the enterprise may be the

---

9. Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." Section 1962(d) makes it unlawful for any person to conspire to violate § 1962(c).

"vehicle" through which the unlawful pattern of racketeering activity is committed. *Id.*

■ In addition, we have consistently held that the same entity cannot do "double duty" as both the RICO defendant and the RICO enterprise. *See, e.g., Miranda v. Ponce Federal Bank,* 948 F.2d 41, 44–45 (1st Cir.1991) (citations omitted). The person or persons alleged to be engaged in racketeering activity must be entities distinct from the enterprise. *Odishelidze v. Aetna Life & Casualty Co.,* 853 F.2d 21, 23 (1st Cir.1988) (per curiam). In other words, because the racketeer and the enterprise must be distinct, *Miranda,* 948 F.2d at 45, the enterprise must be an entity separate from the named defendants who are allegedly engaging in unlawful activity.

The district court granted summary judgment against Appellants, finding that they had failed to show the existence of an "enterprise." Relying on *Turkette,* the court held that Appellants had adduced no evidence that the Appellees formed an association-in-fact or that they functioned as a continuing unit. The district court reasoned that the record shows only that the Appellees came together for one "ephemeral gathering," the clinic blockade in Puerto Rico on January 8; it does not, the court continued, indicate that this activity emanated from an association distinct from the activities themselves. Appellants now contend that the district court erred in granting summary judgment on these grounds.

■ Appellants have offered evidence regarding the structure, organization, and various activities of the Appellees Rescue America, SLC, and PLRT, and claim that it establishes that each of these groups is an "association-in-fact" enterprise. This argument, however, misses the point of our holdings in *Miranda,* 948 F.2d at 44–45 and the cases cited therein. To support the Appellants' RICO claim, the record must contain evidence that the Appellees—Rescue America, SLC, PLRT, and the individuals—constitute and operate as part of an association-in-fact enterprise. In other words, Appellants must show the existence of the enterprise, *of which* the Appellees were a part. As a matter of law, it is not sufficient that several organized, ongoing groups come together for one concerted action, *unless* those groups can also be shown to constitute a larger unit, over and above their separate structures and operations,[10] and that this unit meets the *Turkette* criteria for an "association-in-fact."

We disagree with the district court's characterization of the January 8 blockade as an "ephemeral gathering"; despite Appellees' protestations to the contrary, it is clear that a substantial amount of planning and coordination occurred among the Appellees in preparation for the January 8 incident.[11] This evidence alone, however, is insufficient to show an enterprise. There are five clinic blockades at issue here; at only the January 8 protest, however, were all of the Appellees present or represented. The record shows that the other four protests were organized and conducted solely by Appellee Welch, members of the PLRT, and on one occasion, Carlos Sánchez. Evidence of the one blockade's coordination therefore does not lead ineluctably to a conclusion that the Appellees belong to or constitute an ongoing organization that functions as a continuing unit.

Appellants contend that under the generous standard of review for summary judgment, this one well-planned blockade *could* indicate the existence of an enterprise, and that summary judgment was therefore improperly granted. We have repeatedly held, however, that mere conjecture does not suffice to create a factual dispute and overcome a summary judgment motion. *Thomas v. Metropolitan Life Ins. Co.,* 40 F.3d 505, 508 (1st Cir.1994) (citations omitted). While the

---

10. This is not to say that the separate structures and distinct activities of each Appellee are irrelevant. Evidence of structure, organization, or operations could indicate that the groups' regular course of conduct involves their functioning as part of a larger enterprise. It is not, however, sufficient in itself to show the existence of the enterprise.

11. These planning efforts include the financing and arranging of Treshman and Martin's travel to Puerto Rico, drafting and issuance of press releases, preparation of banners, placards, and flyers, and the coordination of meetings, press conferences and the blockades themselves.

January 8 blockade "could" be just the tip of the alleged enterprise's iceberg, this speculation can not defeat summary judgment. Without more, one could just as reasonably speculate that the January 8 blockade was a well-coordinated but one-time activity of several similar but otherwise unconnected parties, and not an act by members of an ongoing organization.

■ The Appellants also argue that because there were numerous blockades, all using the same methods and involving similar groups and individuals, and all for the purpose of preventing abortions, it follows that an enterprise exists. Certainly, these Appellee organizations and individuals have similar objectives, and use similar methods of attaining those goals—some lawful or even constitutionally protected, some not. Yet similarity of goals and methods does not suffice to show that an enterprise exists; what is necessary is evidence of systemic linkage, such as overlapping leadership, structural or financial ties, or continuing coordination.

Furthermore, we are mindful of the Supreme Court's admonition in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 930–932, 102 S.Ct. 3409, 3434–36, 73 L.Ed.2d 1215 (1982), that liability for mere membership in an association, particularly when that association is ideological, may conflict with the First Amendment. *See also Scheidler*, ——— U.S. at ———, 114 S.Ct. at 807 (Souter, J., concurring) (discussing possible First Amendment issues raised by RICO actions against protest groups). In light of these constitutional concerns, it is particularly important that Appellants present sufficient evidence, beyond the Appellees' similarity of viewpoint, rhetoric and strategy, to show an enterprise.

To this effect, Appellants have submitted a press release [12] written in Spanish and issued by Rescue America in Houston, dated March 4, 1994 (one year after the blockades), the certified translation of which reads in pertinent part:

> Don Treshman, the controversial national director of the anti-abortion group Rescue America, announced today in Houston a campaign to stop all abortions in Puerto Rico. Treshman stated that worldwide Puerto Rico is already considered a pro-life success because of the actions taken by a local *affiliated* group, the Pro–Life Rescue Team. 'The time is coming *to finish what we have started,*' said Treshman. At the same time, Treshman announced that Father Patrick Welch will arrive in Puerto Rico tomorrow.... Father Welch was arrested together with Treshman last year as a result of a blockade in front of an abortion clinic in San Juan.... 'Father Welch is *representing Rescue America as the regional director*' ... Rescue America is well known for its creative tactics used to block abortion clinics in all parts of the United States and in other countries. Treshman said that it is 'very probable' that *an anti-abortionist group from the United States* may come to Puerto Rico within a short time, *for the second time 'to participate with local pro-life groups.'* He refused to indicate whether the radical group is planning to block access to some of the abortion facilities ..., but he said that '*they will use all the methods that they believe necessary* to save the lives of the innocent unborn.' Father Welch will supposedly give more details during a press conference today....

(Emphasis added). Additionally, although Appellee Welch denied that the PLRT was affiliated with any other organization, he stated that he "shared information" with other groups, including Rescue America, on a regular basis, by faxing and mailing tactical manuals, videos, pamphlets, press releases, and activity updates to one another.

■ These facts, viewed in the light most favorable to the Appellants, strongly suggest that the Appellees Rescue America, PLRT,

---

12. We reject Appellees' contention that the press release is inadmissible hearsay. The press release is not hearsay, but admissible evidence as an admission of a party-opponent under Fed. R.Evid. 801(d)(2)(A).

Appellants also point to statements allegedly made by Welch and reported in a local newspaper as supporting the existence of an enterprise. These newspaper articles, unlike the press release, are hearsay, and thus inadmissible to prove the truth of the matters asserted therein.

Welch, and Treshman constitute or are part of an "association-in-fact." Rescue America's press release claiming, if not boasting of, its "affiliation" with the PLRT, and naming Welch as a "regional director," is highly competent evidence that the two groups are connected in a somewhat formal sense, and that they share common leaders or organizers—in other words, that they function as a continuing unit. That the press release announced the groups' plans to "continue" their efforts in Puerto Rico, over a year *after* the blockades, also indicates an ongoing relationship among those Appellees. We therefore find that the Appellants have adduced sufficient evidence of an "enterprise" among Rescue America, Welch, Treshman, and the PLRT to defeat summary judgment, and we reverse the district court's ruling as to the existence of an enterprise.

■ Appellants have not, however, pointed to any competent evidence that the Appellees Weslin, Martin, or the SLC have been or are associated with any of the other Appellees on an ongoing basis, or that they function with them as part of a continuing unit. In fact, the record shows nothing more than that those Appellees planned and participated in one blockade with the others. Furthermore, although Welch testified that he communicates with Appellee Sánchez as often as every other day about their groups' activities, he denied that they ever discussed blockades, and we find no evidence in the record to indicate otherwise, or suggesting that Sánchez is associated with the PLRT or Welch. We therefore find that the Appellants have not adduced sufficient evidence that Weslin, Martin, Sánchez, and the SLC are part of any RICO enterprise, and affirm the district court's dismissal of Appellants' RICO claims as to those Appellees only.

### 2. *Have Appellants established a "pattern of racketeering activity"?*

■ Under the terms of the RICO statute, a "pattern of racketeering activity requires at least two acts of racketeering

activity." 18 U.S.C. § 1961(5). The definitional section "does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern." *H.J. Inc. v. Northwestern Bell Telephone Company,* 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195. The two predicate acts of racketeering activity must be acts chargeable or indictable under any one or more of certain specified criminal laws. *Feinstein,* 942 F.2d at 42; 18 U.S.C. § 1961(1)(B). These acts include "extortion" as it is defined in the Hobbs Act, 18 U.S.C. § 1951(b)(2).[13] In addition, a RICO plaintiff must demonstrate that the predicate acts are related, and that they amount to or pose a threat of continued criminal activity. *H.J. Inc.,* 492 U.S. at 237, 109 S.Ct. at 2899–2900.

### a. Relatedness

■ We have noted that "the relatedness test is not a cumbersome one for a RICO plaintiff." *Feinstein,* 942 F.2d at 44. A RICO plaintiff establishes that predicate acts are related by demonstrating that they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901; *see also Fleet Credit Corp. v. Sion,* 893 F.2d 441, 445 (1st Cir.1990). A fact-specific allegation of a single common scheme can be used to satisfy the relatedness requirement. *Feinstein,* 942 F.2d at 44. As the district court succinctly and correctly noted, there is little doubt in this case that the alleged predicate acts are related.

■ Appellees state, however, that the "relatedness" requirement is not met as to Treshman and Rescue America, as the record does not reflect that they engaged in more than one predicate act. This bare assertion seems to rest on the faulty premise that each blockade constitutes only one predicate act. Appellees ignore the possibility that more than one predicate act—that is,

---

**13.** As we explained above, this provision defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear."

The intangible right to freely conduct one's lawful business constitutes "property" for purposes of this section. *Northeast Women's Ctr. v. McMonagle,* 868 F.2d 1342, 1350 (3d Cir.1989).

more than one act that constitutes extortionate activity—may have been committed at each blockade, including the January 8 blockade in which Rescue America and Treshman participated. For example, several instances of vandalism, harassment, and verbal threats occurred at the one blockade at which Treshman and Rescue America were present; each instance is arguably an extortionate, predicate act.

Furthermore, the physical presence of all the Appellees in Puerto Rico is not necessarily required for the acts to be related, particularly for the Appellants' conspiracy claim. We have held that "a RICO conspiracy [under § 1962(d) ] does not demand total fusion or that all defendants participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with all other defendants." *United States v. Boylan, et al.,* 898 F.2d 230, 242 (1st Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). The plaintiff need only show that the component parts of a conspiracy were linked together in such a way as to afford a plausible basis for the inference that an agreement existed. *Id.* A RICO conspiracy claim under § 1962(d) thus covers direct and indirect participation in a predicate act, including preparation, planning, and direction. We therefore affirm the district court's ruling that the Appellants have established that the predicate acts are related.

### b. Continuity

▇▇▇ In order to establish the continuity of the predicate acts, a plaintiff must show either 1) that the acts amount to continued criminal activity, in that the related acts extend over a period of time; or 2) that the predicate acts, though not continuous, pose a threat of continued activity. *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902; *Fleet Credit Corp.,* 893 F.2d at 446. Because RICO was intended by Congress to apply only to enduring criminal conduct, predicate acts extending over a few weeks or months do not generally satisfy this requirement. *Feinstein,* 942 F.2d at 45. Under the second, "threat" approach, however, even where the predicate acts occur in a narrow time frame, the requirement can still be satisfied by demonstrating "a realistic prospect of continuity over an open-ended period yet to come." *Id.* This approach "necessitates a showing that 'the acts themselves include a specific threat of repetition extending indefinitely into the future, [or] ... are part of an ongoing entity's regular way of doing business.'" *Id.* (quoting *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902).

Under the first method of establishing continuity, the district court found, we think correctly, that the five blockades over a three-month period did not constitute a closed-end period of continued criminal conduct. Appellants do not specifically contest this finding here. Rather, they challenge the district court's finding that the record does not reveal "a realistic prospect that the activity challenged in this suit will resume with enduring effects," and that therefore, no continuity was established.

▇▇▇ Appellants point out that the predicate acts involved in this case—the blockades, vandalism, and the threatening harassment of clinic personnel and patients—are part of the regular way that the defendants conduct their ongoing activities. The entire purpose of Rescue America, the PLRT, and their leaders, contend the Appellants, is preventing abortions, and they do this by regularly using unlawful as well as lawful tactics. Appellants further argue, and the record shows, that part of the Appellees' strategy is to strike randomly with little or no warning of which clinic they will target, making it inherently difficult or impossible to determine whether and when they will blockade again. There is also evidence that Rescue America has been conducting protests and blockades for several years, and shows no signs of abating or changing its unlawful tactics. Indeed, the March 4, 1994 press release, quoted in relevant part above, strongly indicates that the Appellees plan to continue their activities in Puerto Rico, lawful and unlawful.

Appellees contend that there is nothing about the challenged conduct that by its nature projects into the future with a threat of repetition. The January 8, 1993 blockade, they claim, was a "special gathering," an event unlikely to be repeated. They point

out that Treshman left Puerto Rico after the blockade and has "no immediate plans to return." It is not the nature of the conduct itself, however, that suggests a threat of continuing; it is the fact that the Appellees' regular way of conducting their affairs involves the illegal acts conducted at that blockade, and that the Appellees have admitted that they plan to "continue their efforts." Moreover, Treshman's physical presence in Puerto Rico is not necessary for Appellees to plan or threaten future unlawful blockade activities in furtherance of the alleged conspiracy. We therefore find that sufficient evidence in the record raises a genuine issue of material fact as to whether the Appellees' conduct posed a threat of continuing activity, and that the district court thus erred in granting summary judgment against the Appellants on this basis.

Accordingly, we remand the Appellants' RICO claims against Appellees Welch, Treshman, Rescue America, and the PLRT only, for further proceedings to determine whether Appellants can prove the elements of their RICO causes of action.

### B. The Appellants' Section 1985(3) claims

The Appellants also claim that Appellees' actions violate the second clause of 42 U.S.C. § 1985(3).[14] The district court granted summary judgment for the Appellees on this claim, holding that the Appellants had not adduced any evidence that Appellees' purpose or intent was to hinder law enforcement authorities from securing for women their right to seek abortions. The court reasoned that because the purpose of the Appellees' activities was "to 'stop the killing of babies,' " or prevent abortions, "and not ultimately to impede law enforcement," the Appellants had not met their burden.

We think that the district court's reasoning on this point misses the trees for the forest. It is akin to saying that a bank robber lacks mens rea and thus cannot be convicted because his ultimate objective was to make money, not to commit robbery. While it is indisputable that the broader objective behind all of the Appellees' actions is the prevention of abortions, the properly framed issue is whether, in effectuating that goal, Appellees purposefully employed tactics designed to prevent the authorities from securing equal protection of the laws to Appellants. In order to address this issue, however, we must first analyze just what constitutes such a violation; put another way, we must determine what a plaintiff must establish in order to maintain a claim under § 1985(3)'s hindrance clause.

We embark on this analysis with relatively little guidance. Although the Supreme Court has interpreted the first clause, called the "deprivation clause," of § 1985(3), it has never construed the hindrance clause, and in fact, has expressly left this question open. *Bray*, — U.S. at — — —, 113 S.Ct. at 764–66. To further complicate matters, several Justices of the *Bray* Court offered conflicting views, in dicta, on the interpretation of the hindrance clause. Nevertheless, the Court's § 1985(3) jurisprudence is instructive here, and is therefore a logical starting point for our analysis.

The Supreme Court has held that in order to prove a private conspiracy under the *deprivation* clause of § 1985(3), a plaintiff must show 1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' actions, and 2) that the conspiracy is aimed at interfering with rights that are protected against private, as well as official, encroachment.[15]

---

**14.** Section 1985(3) provides:

> If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; *or for the purpose of preventing or hindering the constituted authorities ... from giving or securing to all persons ... the equal protection of the laws* ... the party so injured or deprived may

> have an action for the recovery of damages ... against one or more of the conspirators.

(Emphasis added). Only the second clause, called the "hindrance clause," is relevant to the instant case.

**15.** Thus far the Supreme Court has recognized two such rights for deprivation clause purposes: the Thirteenth Amendment right to be free from involuntary servitude, and the right of interstate travel. *Bray*, — U.S. at —, 113 S.Ct. at 764.

*Bray,* —— U.S. at ——, 113 S.Ct. at 758 (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *Carpenters v. Scott,* 463 U.S. 825, 833, 103 S.Ct. 3352, 3358–59, 77 L.Ed.2d 1049 (1983)). These requirements are necessary to limit the clause to its intended, constitutional purpose and prevent its use as a "general federal tort law." *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798.

Applying its deprivation clause precedents to the context of abortion clinic blockades, the Court held in *Bray* that the phrase "otherwise class-based, invidiously discriminatory animus" could not apply to "women seeking abortions" because they were not a protected class. *Bray,* —— U.S. at ——, 113 S.Ct. at 759. The Court further held that the record of that case did not indicate that the protesters were motivated by a purpose directed at women in general, but rather at stopping abortions. *Id.* at —— – ——, 113 S.Ct. at 759–60. The Court did not specifically rule on whether women in general could ever be a protected class; it did state that the "animus" requirement could be met not only by "maliciously motivated" discrimination against women, but by "assertedly benign (though objectively invidious)" discrimination as well. *Id.* at ——, 113 S.Ct. at 759. The Court explained that such assertedly benign discrimination would demand, however, "at least a purpose that focuses on women by reason of their sex—for example (to use an illustration of assertedly benign discrimination), the purpose of 'saving' women because they are women from a combative, aggressive profession such as the practice of law." *Id.* The Court further held that because abortion was a right protected against official, but not private, encroachment, the *Bray* plaintiffs could not maintain their cause of action under the deprivation clause. *Id.* at ——, 113 S.Ct. at 762.[16]

The *Bray* majority (consisting of Justices Scalia, White, Kennedy, and Thomas and Chief Justice Rehnquist) refused to consider any *hindrance* clause claim, stating that such a claim was not properly before the Court. *Id.* at —— – ——, 113 S.Ct. at 764–65. In explaining its refusal to interpret the hindrance clause, however, the *Bray* majority stated in dictum that a cause of action under the hindrance clause "would seem to require the same 'class-based, invidiously discriminatory animus' that the 'deprivation' clause requires." *Id.* at ——, 113 S.Ct. at 765. The majority reasoned that the source of the animus requirement is the statute's language requiring intent to deprive of "equal protection" or "equal privileges and immunities," and that such language appears in the hindrance clause as well. To hold otherwise, the majority explained, would require construing the phrase "equal protection" differently in two clauses of the same statute, contrary to basic principles of statutory construction. *Id.* at —— – ——, 113 S.Ct. at 765–66 (citing *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798). The *Bray* majority also roundly criticized the dissents' arguments that the deprivation clause's second requirement—that the right be protected against private, as well as official, encroachment—would not necessarily apply to the hindrance clause as well. *Id.* at —— – ——, 113 S.Ct. at 766–67.

The four dissenting Justices responded that the plain language of § 1985(3) does not require the same restrictions on a hindrance clause cause of action. Justice Souter contended that neither restriction would apply to the hindrance clause. *Id.* at ——, ——, 113 S.Ct. at 776–77 (Souter, J., dissenting). Justices Stevens and Blackmun argued that a class-based animus was required under the hindrance clause, but that it can be inferred if the conspirators' conduct burdens activities that are performed exclusively by members of a protected class, such as women. *Id.* at ——, 113 S.Ct. at 787 (Stevens, J., dissenting). Justice O'Connor, joined by Justice Blackmun, contended that class-based animus is required. She went on to argue that women are a protected class, and that class-based discrimination is met whenever the motivation of the conspirators is directly related to the characteristics of that class, such as the ability to become pregnant or to ter-

---

16. The *Bray* majority also rejected the plaintiffs' claim that the protesters' activities deprived them of their right to interstate travel, holding that impairment of the protected right must be "a conscious objective" of the conspirators. *Id.* at ——, 113 S.Ct. at 762.

minate pregnancy. *Id.* at ——, 113 S.Ct. at 801 (O'Connor, J., dissenting). Further, Justice O'Connor argued, the hindrance clause does not require that the constitutional right be one protected against private encroachment. *Id.* at ——, 113 S.Ct. at 803 (O'Connor, J., dissenting).

Only one court has interpreted the requirements of the hindrance clause in the rather muddy wake left by *Bray.* In *National Abortions Fed'n v. Operation Rescue,* 8 F.3d 680 (9th Cir.1993), the Ninth Circuit examined the varying opinions of the *Bray* justices in light of the language of the statute itself, and decided that the hindrance clause provides a cause of action only where the purposeful hindering of the police was directed at a protected class exercising a constitutional right. *National Abortions Fed'n,* 8 F.3d at 685. It would be considered "directed at the class" if the activity is one exclusively engaged in by that class. *Id.* The court therefore held that "a conspiracy to prevent or hinder state law enforcement officers from securing the constitutional rights to an abortion for women, a class exclusively seeking to exercise that right, is actionable under the hindrance clause." *Id.* at 687. Not surprisingly, the Appellants urge us that *National Abortions Fed'n* is persuasive and applicable here, whereas Appellees contend that the Ninth Circuit's reasoning is unsound and the facts entirely distinguishable from those at bar.

Although we find the court's reasoning in *National Abortions Fed'n* helpful, we cannot follow it blindly. Instead, we must perform our own analysis, guided by the statute's language and the cases discussed, to determine 1) whether a claim under the hindrance clause requires some class-based, invidiously discriminatory animus; 2) if so, whether women are such a class; 3) if so, whether Appellants have sufficiently shown that Appellees possess such animus; and 4) whether the hindrance clause encompasses rights protected against official, but not private, encroachment.

17. Appellants merely state that we "need not" rule on whether such an animus is required,

### 1. *Does the hindrance clause require "animus"?*

■ The source of the "animus" requirement for claims under the deprivation clause is the statute's language "requiring intent to deprive of *equal* protection, or *equal* privileges and immunities." *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798 (emphasis in original). By requiring such a class-based animus, the *Griffin* Court was attempting to give full effect to the statute's purpose without creating a "general federal tort law." *Id.* at 101–102, 91 S.Ct. at 1798. In *Bray,* the Court, albeit in dictum, stated clearly that this requirement should also apply to the hindrance clause, lest the same phrase—"equal protection"—be construed differently in the same statute.

We are persuaded by this common sense argument, and Appellants have offered no alternative contentions for our consideration on this issue.[17] We therefore hold that a plaintiff under the hindrance clause of § 1985(3) must show that the alleged conspiracy was motivated by some class-based, invidiously discriminatory animus.

### 2. *Are women a protected class?*

■ Although it did not expressly answer this question, the *Bray* majority did concede that women may be a protected class for § 1985(3) purposes, and based much of its reasoning on this possibility. *Bray,* —— U.S. at ——, 113 S.Ct. at 759. Certainly, nothing in the statute or its legislative history precludes such a result. The legislative history of § 1985(3) confirms that even though it was primarily motivated by the mob violence directed at the newly emancipated slaves in the Reconstruction era, "its protection extended to 'all the thirty-eight millions of the citizens of this nation.'" *Bray,* —— U.S. at ——, 113 S.Ct. at 785 (Stevens, J., dissenting) (quoting Cong. Globe, 42d Cong., 1st Sess., 484 (1871)). Moreover, it is logical that, at the very least, the classes protected by § 1985(3) must encompass those classifications that merit heightened scrutiny under Equal Protection Clause analysis, of which gender is

because they have adduced sufficient evidence that Appellees have demonstrated such animus.

one. *See id.* at ——, 113 S.Ct. at 801 (O'Connor, J., dissenting).

Perhaps not surprisingly, then, several other circuits addressing this question have all concluded that women fall within the statute's protection. *See, e.g., National Org. for Women v. Operation Rescue,* 914 F.2d 582, 585 (4th Cir.1990); *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1359 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *Volk v. Coler,* 845 F.2d 1422, 1434 (7th Cir.1988); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n,* 584 F.2d 1235, 1244 (3d Cir.1978) (en banc), vacated on other grounds, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

Accordingly, we hold that women are a protected class falling within the ambit of the protections afforded by § 1985(3).

### 3. *Have Appellants shown that Appellees possess an invidiously discriminatory animus against women?*

■■ The Appellants contend that they have adduced ample evidence that the Appellees are motivated in their actions by a maliciously motivated animus against women in general. They point out that the protesters who blockade the clinics scream discriminatory epithets to women attempting to enter, such as "lesbians, killers … lesbians can't have babies." Appellee Weslin testified as to his belief that many women who are pro-choice are "lesbians," "drug addicts" who "barbecue babies" in front of the clinics, "satan worshippers," and "people who surround baby killers."

Appellants also contend that Welch and Weslin have both amply demonstrated an assertedly benign but objectively discriminatory animus towards women. They point to testimony of both Welch and Weslin that most women are ignorant about abortion, and that they believe they must inform women of the "true" facts about abortion in order to "save" the women from being "victimized" by friends, family and society. Welch testified that the women seeking abortions at the clinics are so "grossly ignorant" that they are not "culpable" for "murdering" their babies, and that it is his job to "protect" women from their own decisions to have abortions.

Appellees argue that these remarks are intended to "empower" women, and that Appellants mischaracterize them in labelling them as paternalistic and patronizing. Appellees' strenuous contentions to this effect are wholly conclusory, however, and therefore cannot serve as the basis for a judgment as a matter of law. The Appellants have pointed to a great deal of testimonial evidence that at the very least raises a genuine dispute as to whether the Appellees possess discriminatory animus towards women, and this issue is material to the outcome of their § 1985(3) claim. We therefore find that the district court erred in granting summary judgment on these claims, and remand for further proceedings to determine whether Appellees possess a discriminatory animus, either overtly malicious or assertedly benign, against women in general. Unless such animus can be established, Appellants' hindrance clause claims must be dismissed.

### 4. *Does the hindrance clause encompasses rights protected only against official, but not private, encroachment?*

■■ Section 1985(3) does not " 'provide[ ] any substantive rights itself' to a class conspired against." *Carpenters,* 463 U.S. at 833, 103 S.Ct. at 3358 (quoting *Great Am. Fed'l Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979)). The rights, privileges, and immunities that § 1985(3) vindicates must therefore be found elsewhere, presumably in the Constitution. *Id.* In *Carpenters,* the Court examined § 1985(3) in its entirety and concluded that a conspiracy to infringe First Amendment rights (protected only against official, but not private, encroachment) "is *not* a violation of § 1985(3) *unless* it is proved that the State is involved in the conspiracy *or* that the aim of the conspiracy is to influence the activity of the State." *Carpenters,* 463 U.S. at 830, 103 S.Ct. at 3357 (emphasis added). When the right deprived is one protected against only official encroachment, a plaintiff must prove that "the State was somehow involved in *or affected by* the conspiracy." *Id.* at 833, 103 S.Ct. at 3359 (emphasis added). Claims brought specifically under the

*deprivation* clause of § 1985(3)—that is, alleging that a private conspiracy is aimed at the *deprivation* of a constitutional right—must therefore allege that the right infringed is one guaranteed against both official and private encroachment. *Id.* (emphasis added); *Bray,* —— U.S. at ——, 113 S.Ct. at 758 (affirming that claims under the *deprivation* clause must allege a right protected against both private and official encroachment).

When a claim is brought under the *hindrance* clause—that is, alleging a conspiracy to hinder or impede law enforcement officials from securing equal protection of the laws to a class of citizens—the same constitutional and policy concerns are not triggered. The hindrance clause, unlike the deprivation clause, implicates the *ability* of the State to ensure and safeguard rights protected against any infringement. When private individuals conspire for the purpose of arresting or impeding the State's power to protect or secure equal protection of the laws to a group of citizens, those conspirators are supplanting the State's conduct with their own. It seems clear to us that such a conspiracy is precisely the type that the *Carpenters* Court was referring to when it discussed a conspiracy "to influence the activity of the State" and thereby prevent it from securing equal protection of the laws to its citizens. *Carpenters,* 463 U.S. at 830, 103 S.Ct. at 3357. When the State's conduct is thus arrogated, state action is clearly implicated, and rights protected only against official infringement are likewise implicated.

Moreover, because the hindrance clause applies only to conspiracies to hinder or impede state officials, it does not raise the same "specter of federalizing general tort laws," one of the major concerns expressed in *Griffin* and *Carpenters. National Abortions Fed'n,* 8 F.3d at 685. The hindrance clause provides a cause of action only where the purposeful hindering of state officials was directed at denying or infringing on the rights of a group of citizens; it is, therefore, considerably narrower by its own terms than the deprivation clause, and could not be used

to vindicate ordinary trespasses or torts in federal court. *See id.*

We therefore hold that claims brought under the hindrance clause of § 1985(3) do not require that the right allegedly infringed be one guaranteed against private encroachment, but need only be one guaranteed against official encroachment.

This is not to say that any action which delays, impedes or hinders law enforcement officials is actionable under the hindrance clause. The right infringed as a result of the conspiracy must be constitutionally protected or guaranteed, and the *purpose,* not merely the *effect,* of the conspiracy, must be to impede state officials in their efforts to secure equal protection of the laws.

Applying these principles here, we examine the record to determine if Appellants have shown sufficient evidence to raise a genuine dispute over whether Appellees intended to hinder law enforcement officials from securing to women their constitutionally protected right to abortion. Appellees contend that there is no evidence that they intended to hinder police efforts in any way. The testimony of Appellees Welch and Weslin, however, belies this contention. Welch testified that their purpose is to close down the clinics and thereby prevent abortions. Weslin admitted during his testimony that one of the reasons that the protesters intentionally go limp or flail their limbs when arrested by the police is to make it more difficult and time-consuming for the police to arrest them, thereby "buying time" for the unborn.

This evidence of the Appellees' statements and tactics, while not conclusive, is certainly sufficient to raise a genuine dispute as to whether Appellees' intent was to hinder law enforcement officials, an issue of fact material to the Appellants' claims. We therefore hold that summary judgment was improperly granted, and remand these claims to determine whether Appellees intended to hinder law enforcement officials from securing to women their right to obtain abortions.[18]

18. Appellees also contend that there is no evidence in the record that a conspiracy exists among them. This contention simply has no

merit. The evidence indicates that the blockades are mobilized on a large scale, with many individuals acting in an tightly organized, disciplined

## IV.  CONCLUSION

For the foregoing reasons, we *affirm in part, dismiss in part,* and *reverse and remand for proceedings consistent with the instructions stated in this opinion.*

fashion.  The overt acts of the alleged conspiracy include: mobilizing, organizing, and orienting all the blockades' participants; transporting participants to the clinics; ordering the "mangled-fetus" stickers used to deface clinic property; organizing and preparing banners and placards used to block clinic entrances; drafting and distributing press releases to recruit participants; arranging and financing travel to Puerto Rico; and the delay tactics described above.  All of this evidence raises at least a genuine issue as to whether a conspiracy exists, and we therefore find that summary judgment was improperly granted.