**Lussier v. Subaru of New England      CV-99-109-B    01/13/00**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

George Lussier Enterprises, Inc.,
d/b/a Lussier Subaru, et al.

   v.                                    Civil No.  C-99-109-B
                                Opinion No. 2000 DNH 013

Subaru of New England, Inc., et al.

## MEMORANDUM AND ORDER

Seven current and former New England Subaru dealers have filed a class action complaint against their distributor, Subaru of New England, Inc. ("SNE") and its sole shareholder, Ernest Boch.  The dealers claim that Boch directs SNE to withhold approximately 10% of the new Subaru vehicles destined for the New England market and allocates these "discretionary" vehicles only to dealers who agree to purchase Subaru vehicles with expensive and unwanted accessories.  They also allege that Boch and SNE used the mails and interstate wires to lock the dealers into dealership agreements through false promises that SNE would

allocate vehicles equitably.  As a result, they claim that SNE

and Boch are liable for injunctive relief and damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.  SNE and Boch have moved to dismiss the dealers' RICO claims pursuant to Fed. R. Civ. P. 12(b)(6).[1]

## I.

SNE is the exclusive distributor of Subaru vehicles in New England.[2]  In this capacity, it has entered into franchise agreements with all of the region's Subaru dealers.  The franchise agreements contain or incorporate by reference certain standard provisions dictated by Subaru's national distributor, Subaru of America, Inc.  One such provision states that "It is understood and agreed that [SNE] will allocate all affected

---

[1]  The dealers also claim that SNE has breached its dealer contracts, violated federal antitrust laws and is liable under various state dealer protection statutes.  I disposed of SNE's motion to dismiss the antitrust claim in a prior order. Defendants have not challenged the sufficiency of the dealers' state law claims.

[2]  I take the facts from the complaint and describe them in the light most favorable to the plaintiffs.  See Miranda v. Ponce Fed. Bank, 948 F.2d 41, 43 (1st Cir. 1991).

Subaru products equitably, using appropriate factors such as the

respective inventory levels and sales performance of [its] dealers during a representative period of time immediately prior to such allocation." Dealership Agreement and Standard Provisions, Defendants' Joint Appendix, Tab A(1) at 9.[3]

SNE implemented a vehicle distribution plan on February 1, 1987, dubbed "Fair Share II." Under this plan, SNE allocates 90% of its vehicles to dealerships based upon a formula tied to the number of vehicles each dealership sells during a given allocation period. The plan specifies that SNE may withhold the remaining "discretionary vehicles" and use them for "executive vehicles and discretionary purposes such as market action vehicles."[4] Fair Share II Distribution System, Defendants' Joint

---

[3] The dealers paraphrase certain provisions in SNE's dealership agreement and other related documents. I quote from the documents, which were supplied by the defendants in support of their motion. See Beddall v. State St. Bank and Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998) (motion to dismiss is not converted into a motion for summary judgment when court considers document referred to in the complaint if the plaintiff's cause of action depends on the document and the document's authenticity is not in dispute).

[4] The plan elsewhere defines "discretionary vehicles" as "[v]ehicles to be used as demonstrators by Subaru of New England;

-5-

Appendix, Tab B(2).

At some point not specified in the dealers' amended complaint, but after they incurred substantial costs to develop their dealerships, SNE began to condition a dealer's access to discretionary vehicles on the dealer's agreement to purchase vehicles with unwanted accessories, such as leather seats, keyless entry systems, CD players, and air filtration systems. The dealers characterize this practice as an "option-packing scheme." Because SNE withholds a disproportionate number of Subaru's most popular models as discretionary vehicles, the dealers have little choice but to accede to SNE's demands. As a result, they allegedly have been forced to purchase an average of $480 in unwanted accessories on each vehicle SNE has allocated and sold to the dealers.

The dealers claim that the "option-packing scheme" constitutes extortion under the Hobbs Act. The also assert that

---

vehicles to be used for major auto shows; vehicles set aside to assist dealers who, at the sole discretion of Subaru of New England, need assistance and vehicles delivered to VIPs." Defendants' Joint Appendix, Tab B(3) (emphasis in original).

Boch and SNE have committed mail and wire fraud by using the mails and interstate wires to lock the dealers into agreements through false promises that SNE would allocate vehicles equitably.

## II.

To survive a motion to dismiss for failure to state a claim, a plaintiff's complaint must "set forth 'factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery.'" Doyle v. Hasbro, Inc., 103 F.3d 186, 190 (1st Cir. 1996) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)). When applying this standard, I must accept the well-pleaded facts of the complaint as true and draw all reasonable inferences in favor of the plaintiff. See Miranda v. Ponce Fed. Bank, 948 F.2d 41, 43 (1st Cir. 1991). I may dismiss the complaint "only if, when viewed in this manner, the pleading shows no set of facts which could entitle the plaintiff to relief." Gooley, 851 F.2d at 514 (citing Conley v.

<u>Gibson</u>, 355 U.S. 41, 45-48 (1957)).

The threshold for stating a claim under the federal rules "may be low, but it is real." <u>Id.</u> While I must construe all well-pleaded facts in the plaintiff's favor, I need not credit "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." <u>Doyle</u>, 103 F.3d at 190 (quoting <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir. 1996)) (internal quotation marks omitted).

## III.

The dealers identify three distinct RICO claims in their amended complaint. In Count I they claim that SNE is liable because it conducted or participated in the conduct of an enterprise through a pattern of racketeering. <u>See</u> 18 U.S.C. § 1962(c) (1994). They charge in Count II that SNE is liable because it invested the proceeds of racketeering activity in an enterprise. <u>See</u> 18 U.S.C. § 1962(a) (1994). They assert in Count III that Boch is liable pursuant to § 1962(c) because he conducted or participated in the conduct of an enterprise through

a pattern of racketeering. <u>See</u> 18 U.S.C. § 1962(c). I address defendants' challenge to each count in separate sections.

**A. <u>Count I: The Section 1962(c) Claim Against SNE</u>**

Section 1962(c) provides in relevant part that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). To be liable under § 1962(c), a person must (1) "conduct or participate . . . in the conduct" of (2) an "enterprise" (3) through a "pattern" (4) of "racketeering activity." <u>Id.</u>; <u>see</u> <u>Selima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 496 (1985) (identifying elements of § 1962(c) claim).

The dealers claim in Count I that SNE is liable pursuant to § 1962(c) because it conducted or participated in the conduct of either a network of Subaru dealers known as the New England Subaru Dealer Network or Subaru of America through a pattern of

extortion, mail and wire fraud.  SNE challenges the sufficiency of Count I.  It argues that the dealers cannot state a claim that SNE conducted or participated in the conduct of the New England Subaru Dealer Network through a pattern of racketeering because the Network does not qualify as an "enterprise."  It also asserts that the dealers cannot claim that Subaru of America is the "enterprise" because SNE did not "conduct or participate . . . in the conduct" of Subaru of America's affairs.  I address each argument in turn.

### 1.  The New England Subaru Dealer Network as a RICO Enterprise

The dealers charge that the "New England Subaru Dealer Network" is an association-in-fact enterprise comprised of "[c]ertain corporations doing business in the New England states which have held Subaru franchises, and individuals who are officers and directors of said corporations."  First Am. Compl. (Doc. #31) ¶ 53 at 17.

An association-in-fact enterprise must be "an ongoing organization" whose members "function as a continuing unit" and

are "associated together for a common purpose of engaging in a course of conduct." <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981); <u>see</u> <u>also</u> <u>Aetna Cas. Sur. Co. v. P & B Autobody</u>, 43 F.3d 1546, 1557 (1st Cir. 1994). In addition, an association-in-fact enterprise must have an existence "separate and apart from the pattern of [racketeering] activity in which it engages." <u>Turkette</u>, 452 U.S. at 583; <u>see</u> <u>also</u> <u>Aetna Cas.</u>, 43 F.3d at 1557.

A distinct structure is the hallmark of an association-in-fact enterprise. For a plaintiff seeking to establish the existence of such an enterprise, "it is not sufficient that several organized, ongoing groups come together for one concerted action." <u>Libertad v. Welch</u>, 53 F.3d 428, 442 (1st Cir. 1995). Rather, a plaintiff must show that the associated groups "constitute a larger unit, over and above their separate structures and operations." <u>Id.</u> A plaintiff may accomplish this goal by producing "evidence of systematic linkage, such as overlapping leadership, structural or financial ties, or continuing coordination." <u>Id.</u> at 443.

The conclusory nature of the dealers' allegations regarding the "New England Subaru Dealer Network" makes it impossible to infer that the Network qualifies as an association-in-fact enterprise.[5] The complaint fails to provide any factual allegations that would suggest that the Network is an ongoing organization, that its members function as a continuing unit and share a common purpose, that it has an existence separate from the racketeering activities allegedly conducted by SNE, or that it has a larger structure distinct from the individual franchises that allegedly form its membership. Accordingly, I conclude that the dealers have failed to state a cognizable claim that the Network qualifies as a RICO enterprise.

---

[5] The dealers' allegation that the membership of the Network consists of both corporations and individuals does not, in itself, pose a problem. Although the statutory definition of an association-in-fact enterprise refers to "any union or group of individuals," 18 U.S.C. § 1961(4) (1994) (emphasis added), the First Circuit has ruled that such an enterprise may be comprised of legal entities or a combination of individuals and legal entities. See United States v. London, 66 F.3d 1227, 1243 (1st Cir. 1995) (citing Libertad, 53 F.3d at 444).

## 2. Subaru of America as a RICO Enterprise

Having determined that New England Subaru Dealer Network cannot serve as the enterprise supporting Count I, I next consider whether the dealers can satisfy this requirement by naming Subaru of America as the enterprise. SNE does not dispute the dealers' claim that Subaru of America meets the statutory definition of an enterprise. See 18 U.S.C. § 1961(4). Instead, it argues that Subaru of America cannot serve as the enterprise because the complaint fails to sufficiently allege that SNE "conduct[ed] or participat[ed], directly or indirectly, in the conduct of" Subaru of America. See 18 U.S.C. § 1962(c).

The proper place to begin an analysis of SNE's argument is the Supreme Court's opinion in Reves v. Ernst & Young, 507 U.S. 170 (1993). In Reves, the defendant was an outside accounting firm hired to audit the books of the farm cooperative that was identified as the RICO enterprise. See id. at 173-75. The Court interpreted the "conduct" element of § 1962(c) to mean that the accounting firm was only liable if it had "participate[d] in the

-13-

operation or management of the [RICO] enterprise itself." Id. at 185. To satisfy this "operation or management" test, the Court explained, a RICO defendant must take "some part in directing the enterprise's affairs," but need not have "primary responsibility for [those] affairs." Id. at 179 (emphasis in original).

The Reves Court drew a distinction between "insider" defendants, who were employed by or otherwise affiliated with the enterprise, and "outsider" defendants, who occupied no formal position within the enterprise. The Court determined that its "operation or management" test applied to "outsiders;" therefore, "outsiders" could be liable under § 1962(c). See id. at 185.[6] The Court indicated, however, that there were limits on the exposure of such "outside" defendants to liability, noting that

_____

[6] The First Circuit has narrowed the application of Reves by holding that the "operation or management" test applies only to RICO defendants who are "outsiders." See United States v. Owens, 167 F.3d 739, 754 (1st Cir.) ("Reves's analysis does not apply where a party is determined to be inside a RICO enterprise."), cert. denied, 120 S. Ct. 224 (1999), and cases cited therein. Because SNE is an "outside" defendant relative to the Subaru of America enterprise, I apply the Reves analysis here.

-14-

"§ 1962(c) cannot be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." Id. (emphasis in original).

Applying Reves, the critical question under the "conduct" element of § 1962(c) is whether the complaint sufficiently alleges that SNE participates in the operation or management of Subaru of America. The dealers argue that they have satisfied this element by alleging that Subaru of America has (1) "authorized SNE to distribute Subaru vehicles through dealerships selected by SNE"; (2) named SNE its exclusive New England distributor; and (3) required dealers to obey SNE's reasonable written directives. See First Am. Compl. (Doc. #31) ¶ 52 at 16. I disagree.

While the dealers allege that SNE acquired its power to exploit the dealers as a result of its relationship with Subaru of America, the amended complaint is devoid of any factual

allegations that would support a claim that SNE conducted or participated in the conduct of Subaru of America's affairs.[7]  At most, it alleges that SNE provides services for Subaru of America in the New England area.  Such allegations are not sufficient to support a claim that SNE conducted or participated in the conduct of Subaru of America.  See, e.g., Goren v. New Vision Int'l, Inc., 156 F.3d 721, 728 (7th Cir. 1998); Baumer v. Pachl, 8 F.3d 1341, 1344 (9th Cir. 1993); University of Maryland at Baltimore v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539-40 (3d Cir. 1993); Nolte v. Pearson, 994 F.2d 1311, 1317 (8th Cir. 1993).

As neither the New England Subaru Dealer Network nor Subaru of America can satisfy the enterprise element of the dealers' § 1962(c) claim against SNE, I grant SNE's motion to dismiss Count I.

B.    **Count II: The Section 1962(a) Claim Against SNE**

---

[7]  This case is unlike Aetna Casualty and Surety Co. v. P & B Autobody, 43 F.3d 1546, 1559-60 (1st Cir. 1994), where the defendant caused the alleged enterprise to make payments it otherwise would not have made in furtherance of the defendant's racketeering activities.

The dealers claim in Count II that SNE violated § 1962(a), which prohibits the use or investment of income or proceeds derived from racketeering activities in the acquisition, establishment, or operation of an enterprise. See 18 U.S.C. § 1962(a).[8] The disputed issue that I need to consider under this claim is whether the dealers have sufficiently alleged the requisite "use or investment injury."[9]

---

[8] The statute provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

[9] The rule that the same entity cannot serve simultaneously as both RICO defendant and RICO enterprise applies to a claim under § 1962(c), but not to a claim under § 1962(a). See Schofield v. First Commodity Corp. of Boston, 793 F.2d 28, 31, 32 (1st Cir. 1986). Therefore the dealers may, as they have, designate SNE as both defendant and enterprise in Count II. See First Am. Compl. (Doc. #31) ¶¶ 110, 111 at 35.

To state a claim under § 1962(a), a RICO plaintiff must allege a specific injury caused by the defendant's use or investment of racketeering proceeds.  See Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp., 57 F.3d 56, 91 (1st Cir. 1995).  This "use or investment injury" must be distinct from the injury caused by the alleged predicate acts of racketeering.  In other words, a plaintiff cannot state a claim under § 1962(a) by simply "repeat[ing] the crux of [his or her] allegations in regard to the pattern of racketeering activity."  Id. at 91-92 (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1188 (3d Cir. 1993)).

Other courts have held that the mere reinvestment of racketeering proceeds in a corporate enterprise, with the result that the enterprise continues to engage in the predicate acts of racketeering that generated those proceeds, does not in itself constitute a distinct "use or investment injury."  See, e.g., Fogie v. THORN Americas, Inc., 190 F.3d 889, 896 (8th Cir. 1999); Lightning Lube, 4 F.3d at 1188-89; Update Traffic Sys., Inc. v.

Gould, 857 F. Supp. 274, 282-83 (E.D.N.Y. 1994); Gelb v. American Tel. & Tel. Co., 813 F. Supp. 1022, 1024-25 (S.D.N.Y. 1993). If such reinvestment were sufficient to satisfy the "use or investment injury" requirement, then that requirement "would be almost completely eviscerated when the alleged pattern of racketeering is committed on behalf of a corporation." Lightning Lube, 4 F.3d at 1189 (quoting Brittingham v. Mobil Corp., 943 F.2d 297, 305 (3d Cir. 1991)). As the Third Circuit noted in Lightning Lube:

> Over the long term, corporations generally reinvest their profits regardless of the source. Consequently, almost every racketeering act by a corporation will have some connection to the proceeds of a previous act. Section 1962(c) is the proper avenue to redress injuries caused by the racketeering acts themselves. If plaintiffs' reinvestment injury concept were accepted, almost every pattern of racketeering by a corporation would be actionable under § 1962(a) and § 1962(c) would become meaningless.

Id. (quoting Brittingham, 943 F.2d at 305). I am persuaded by this reasoning that the mere reinvestment of racketeering proceeds in a corporate enterprise, with the result that the enterprise survives and continues to commit predicate acts of

racketeering, is insufficient to satisfy the requirement that a plaintiff identify a distinct "use or investment" injury to state a claim under § 1962(a).

The dealers specify three injuries purportedly caused by SNE's use or investment of racketeering proceeds. First, they claim that SNE used the proceeds of the "option-packing scheme" to pay commissions to sales employees known as "district managers." Because district managers' commissions were tied to the amount of accessories they sold to the dealers, the commission system gave the district managers an incentive to continue to pressure the dealers to purchase unwanted accessories. See First Am. Compl. (Doc. #31) ¶¶ 28-29 at 9, ¶ 118 at 37. Second, the dealers allege that SNE invested racketeering proceeds in a litigation "war chest" that allowed it to outspend and outlast dealers who sought to challenge its practices in court or otherwise. See id. ¶ 119 at 37. Third, the dealers claim that SNE invested racketeering proceeds "in enforcing terminations against disfavored dealers, enforcing

illegal exclusivity provisions in Dealer Agreements, auditing warranty reimbursement claims from dealers, and in retaining lawyers in connection with all of these actions." Id. ¶ 120 at 37. According to the dealers, these actions helped SNE "to weaken the dealer body and render it susceptible to SNE's demands to purchase unordered accessories." Id. ¶ 120 at 38. The dealers claim that as a result of these three tactics, they "suffered lost profits, loss of value of the dealerships, and otherwise were injured in their property and business." Id. ¶ 121 at 38.

The first and third of the dealers' alleged injuries are nothing more than allegations that SNE reinvested the proceeds of the "option-packing scheme" in the enterprise itself, using the funds to fuel a variety of mechanisms that facilitated the continued operation of the scheme. This type of allegation cannot satisfy the requirement that the dealers plead a separate "use or investment injury," because the real injury described is the injury flowing from the underlying racketeering activity.

This is the same injury for which the dealers seek redress in their claim under § 1962(c), and it will not support a separate claim under § 1962(a).

The dealers' second allegation -- that money derived from racketeering was invested in a "war chest" that allowed SNE to overpower the dealers in any dispute -- similarly fails to set forth a separate injury flowing from the use or investment of racketeering proceeds. It is ultimately an argument that SNE used the proceeds of the "option-packing scheme" to prevent the dealers from successfully challenging the scheme, thereby bolstering the scheme and guaranteeing its continued success. The dealers rely on Crowe v. Smith, 848 F. Supp. 1258, 1265 (W.D. La. 1994), in which the court found that the use or investment injury requirement was satisfied by allegations that the defendants used racketeering income to build a "litigation war chest" that funded several fraudulent legal proceedings against the plaintiff. See Pls.' Objection to Boch's Mot. to Dismiss (Doc. #40) at 21. I find Crowe unpersuasive, however, because I

can discern no principled distinction between the creation of a "war chest" and the other mechanisms by which SNE allegedly used the proceeds of the "option-packing scheme" to perpetuate the scheme. Therefore, I conclude that the dealers' allegation that SNE used the proceeds of the "option-packing scheme" to fund a "war chest" does not state a distinct "use or investment injury." This allegation, like the other injuries alleged by the dealers in Count II, replicates the underlying injuries for which the dealers seek relief in their § 1962(c) claim. Accordingly, I grant SNE's motion to dismiss the dealers' claim under § 1962(a).

## C. Count III: The Section 1962(c) Claim Against Boch

The dealers assert a § 1962(c) claim in Count III, this time against Boch. The count identifies SNE as the RICO enterprise and contends that Boch conducted or participated in the conduct of SNE through a pattern of extortion under the Hobbs Act, mail fraud, and wire fraud. Boch argues that this claim is deficient because it fails to sufficiently plead the predicate acts of racketeering activity.

-23-

### 1. Extortion under the Hobbs Act

The Hobbs Act imposes criminal penalties on any person who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion." 18 U.S.C. § 1951(a) (1994). For all purposes relevant to this action, the act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." Id. § 1951(b)(2). Fear of economic loss, generally called "economic fear," is included within the meaning of the statutory term "fear." See, e.g., United States v. Hathaway, 534 F.2d 386, 394 (1st Cir. 1976).

The dealers contend that Boch violated the Hobbs Act by directing SNE to withhold discretionary vehicles from the dealers unless they agreed to purchase vehicles with expensive and unwanted accessories. See First Am. Compl. (Doc. #31) ¶¶ 126-128 at 39. They assert that this practice constitutes extortion because Boch is threatening to withhold discretionary vehicles,

which the dealers need to profitably operate their businesses, as a means to coerce them into paying above-market rates for unwanted accessories.

Assuming without deciding that the dealers have pleaded sufficient facts to support a conclusion that Boch obtained the dealers' property through the wrongful use of economic fear,[10]

---

[10] This case presents a substantial question as to whether the dealers have alleged conduct by Boch that is actionable under the Hobbs Act.  Not every business use of economic fear is inherently unlawful.  See United States v. Sturm, 870 F.2d 769, 773 (1st Cir. 1989).  "Indeed, the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions."  Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 523 (3d Cir. 1998) (distinguishing between legitimate "hard bargaining" and extortion).  One court has distinguished between legitimate and illegitimate uses of economic fear by stating:

> In a "hard bargaining" scenario the alleged victim has no pre-existing right to pursue his business interests free of the fear he is quelling by receiving value in return for transferring property to the defendant, but in an extortion scenario the alleged victim has a pre-existing entitlement to pursue his interests free of the fear he is quelling by receiving value in return for transferring property to the defendant.

Id. at 525 (quoting Viacom Int'l, Inc. v. Ichan, 747 F. Supp.

their Hobbs Act claim nevertheless is defective because they fail to allege that Boch acted with culpable intent. The Hobbs Act punishes only the "wrongful" use of economic fear. See 18 U.S.C. § 1951(b)(2). Central to this requirement is proof that the Hobbs Act defendant knew that he had no right to obtain the property he sought to obtain from the alleged extortion victim. See Sturm, 870 F.2d at 775. In the present case, the dealers do not assert that Boch knew when he directed SNE to implement the "option-packing scheme" that the dealers had a property interest in the discretionary vehicles and that SNE had no right to condition the allocation of these vehicles on a promise to purchase expensive and unwanted automobile accessories. This

205, 213 (S.D.N.Y. 1990), aff'd on other grounds, 946 F.2d 998 (2d Cir. 1991)).

In this case, the amended complaint does not expressly allege that the dealers have a pre-existing entitlement to the discretionary vehicles. Without such an allegation, it is unclear how Boch's alleged conduct could qualify as extortion. I need not resolve this question, however, because I conclude that the amended complaint fails to sufficiently provide that Boch acted with the type of criminal intent that is required for a Hobbs Act violation.

omission is fatal to the dealers' Hobbs claim.[11]

## 2. Mail and Wire Fraud

The dealers also allege that Boch caused SNE to use the United States mails and interstate wires on numerous occasions to send the dealers false representations about the distributor's method for allocating vehicles.[12] While the dealers specify a plethora of false representations, their allegations can be summarized as follows: SNE promised in the dealership agreements to treat the dealers "in a lawful and ethical manner," and stated that it intended to allocate vehicles "equitably," according to

_____

[11] The dealers also allege that Boch violated the Hobbs Act by causing SNE to threaten to terminate dealership agreements unless the dealers agreed to certain concessions. These subsidiary Hobbs Act claims suffer from the same pleading defect as the dealers' primary Hobbs Act claim.

[12] By alleging numerous mailings and wire transmissions in violation of the mail and wire fraud statutes, the dealers have satisfied the requirement that a civil RICO plaintiff allege at least two acts of racketeering activity. Cf. Fleet Credit Corp. v. Sion, 893 F.2d 441, 444 (1st Cir. 1990) (stating that plaintiff who alleged 95 mailings in violation of mail fraud statute "alleged many more than just two predicate acts"). Thus, the dealers' RICO claim against Boch is sufficient even though they cannot rely on the alleged Hobbs Act violations to support their claim.

legitimate business factors, "such as the respective inventory levels and sales performance" of individual dealers. First Am. Compl. (Doc. #31) ¶ 89 at 27; see also id. ¶¶ 95, 96 at 28, 29. SNE assured the dealers that vehicles would not be pre-accessorized and that all accessories were strictly optional. See id. ¶¶ 98, 100, 102 at 30, 31, 32. SNE represented to the dealers' advisory board that discretionary vehicles were withheld for "legitimate business purposes." Id. ¶ 95 at 28. SNE made various other misrepresentations designed to further the "option-packing scheme" by deceiving the dealers about the true nature of the allocation system. See id. ¶¶ 97, 99, 101, 103 at 29, 30-32, 33.

According to the complaint, Boch caused SNE to make these representations. See id. ¶¶ 126, 130 at 39. He also allegedly knew that all of the representations were false at the time that he caused SNE to make them because he actually intended to use the allocation system as a means to force the dealers to purchase pre-installed accessories. See id. ¶ 91 at 27, ¶ 95 at 28, ¶ 96

-28-

at 29, ¶¶ 126, 130 at 39.  Therefore, the dealers claim, the misrepresentations amount to a fraudulent scheme in violation of the federal mail and wire fraud statutes.[13]  The dealers also claim that the allocations themselves, which were allegedly accomplished by means of mail or wire communications, constituted mail or wire fraud.  See id. ¶ 106 at 34-35.

A violation of the mail or wire fraud statutes requires: (1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in

_____

[13]  The mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343 (1994), both provide in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, [makes use of the mails or of interstate wires] . . . for the purposes of executing such scheme or artifice" shall be guilty of an offense.

Because the relevant language in both the mail and wire fraud statutes is the same, I apply the same analysis to both sets of allegations.  See United States v. Boots, 80 F.3d 580, 586 n.11 (1st Cir. 1996).

furtherance of the scheme.[14]  See United States v. Ruiz, 105 F.3d 1492, 1501 (1st Cir. 1997) (mail fraud); United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997) (wire fraud).

In moving to dismiss Count III, Boch contends that the dealers have failed to adequately plead the requisite "scheme or artifice to defraud" because: (1) the alleged misrepresentations were incapable of deceiving and did not actually deceive the dealers, (2) the complaint includes no facts from which fraudulent intent could reasonably be inferred, and (3) many of the alleged communications "were statements of opinion or expectation that typically are not viewed as capable of fraudulent meaning."  Mem. in Support of Boch's Mot. to Dismiss (Doc. #33) at 18-19.  I reject Boch's arguments.

Boch's first contention -- that the alleged misrepresen-

---

[14]  A scheme to defraud under the mail or wire fraud statutes must involve deprivation of money, property, or the right to honest services.  See 18 U.S.C. §§ 1341, 1343, 1346. The dealers plead a deprivation of money and/or property by alleging that SNE's false representations deceived them into purchasing unwanted accessories and losing dealership profits. See First Am. Compl. (Doc. #31) ¶¶ 107, 108 at 35.  Boch does not dispute that the dealers have sufficiently alleged a deprivation.

tations regarding the allocation system neither could have nor did deceive the dealers -- flies in the face of the allegations as presented in the amended complaint. The dealers unambiguously allege that they actually relied to their detriment on various false representations made by SNE at Boch's direction. See First Am. Compl. (Doc. #31) ¶ 90 at 27. This allegation, which I must accept as true for present purposes, flatly contradicts Boch's contention that the alleged misrepresentations did not actually deceive the dealers and were incapable of doing so.[15]

Second, the dealers have alleged sufficient facts to support an inference of fraudulent intent. In the First Circuit, a civil RICO plaintiff must plead predicate acts of mail and wire fraud

---

[15] What is less clear is whether the dealers were required to plead actual (or reasonable) reliance. A conviction under the mail or wire fraud statutes does not require any showing that a person was actually deceived. See, e.g., United States v. Rosen, 130 F.3d 5, 9 (1st Cir. 1997); Czubinski, 106 F.3d at 1075. Courts have disagreed, however, as to whether the standing requirements of the RICO statute add a reliance requirement where the alleged predicate acts include mail and/or wire fraud. Because the dealers alleged actual, detrimental reliance, I need not resolve this uncertain legal issue. See infra, note 17.

with particularity, in accordance with Fed. R. Civ. P. 9(b).  See
Ahmed v. Rosenblatt, 118 F.3d 886, 889 (1st Cir. 1997) (citing
Feinstein v. Resolution Trust Corp., 942 F.2d 34, 42 (1st Cir.
1991); New England Data Serv., Inc. v. Becher, 829 F.2d 286, 290
(1st Cir. 1987)), cert. denied, 118 S. Ct. 1165 (1998).  Rule 9
requires a plaintiff claiming fraud to specify the time, place
and content of allegedly false representations.  See Doyle v.
Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996).  However, as the
rule itself provides, fraudulent intent "may be averred
generally."  Fed. R. Civ. P. 9(b).

The dealers' allegations of mail and wire fraud satisfy the
specificity requirements of Rule 9.  The complaint is suffi-
ciently particular regarding the contents of the communications,
the date of their transmission, and who sent what to whom.  See
First Am. Compl. (Doc. #31) ¶¶ 95-102 at 28-33.  The complaint
also contains a general averment that Boch intentionally caused
SNE to misrepresent the nature of the allocation system with the
fraudulent intent to induce the dealers to enter franchise

relationships and fall prey to the "option-packing scheme."  See id. ¶ 91 at 27, ¶¶ 125, 126, 130 at 37.

Finally, Boch's contention that the alleged misrepresentations were expressions of opinion or aspiration, and therefore cannot form the basis for mail or wire fraud violations, rests on an inaccurate characterization of the communications at issue. Most of the alleged misrepresentations were statements by SNE regarding its system for allocating vehicles.  Some of these statements allegedly were promises to make future allocations on the basis of legitimate business criteria; others purport to describe the actual reasons for past or present allocations. Neither type of statement falls under the rubric of opinion.

Moreover, while an unfulfilled promise does not in itself constitute fraud, a scheme to defraud may be effectuated "by means of false or fraudulent . . . promises."  McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990); see also McNally v. United States, 483 U.S. 350, 359 (1987) (noting that the mail fraud statute "reache[s] false

promises and misrepresentations as to the future"), <u>superseded on</u> <u>other grounds by</u> 18 U.S.C. § 1346 (1994). Speaking in the context of common law fraud, the First Circuit recently explained the distinction between a false promise that constitutes a fraudulent misrepresentation and a broken promise that does not:

> [T]he concept of misrepresentation includes a false representation as to one's intention, such as a promise to act. "A representation of the maker's own intention to do . . . a particular thing is fraudulent if he does not have that intention" at the time he makes the representation. . . . On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation.

<u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 786-87 (1st Cir. 1997) (internal citations omitted). Read in the light most favorable to the dealers, the complaint alleges that Boch caused SNE to falsely represent that it intended to allocate vehicles in accordance with legitimate business criteria, at a time when Boch actually intended to use the allocations as a means to coerce the dealers into purchasing accessories. Therefore, even SNE's representations as to the basis of future allocations support the

-34-

dealers' allegations of a scheme to defraud.

In sum, the dealers claim that Boch caused SNE to make numerous false representations about the vehicle allocation system with the specific intent to defraud the dealers by inducing them first to become Subaru dealers and thereafter to purchase unwanted accessories. These allegations are sufficient to state a scheme to defraud under the mail and wire fraud statutes. Accordingly, I conclude that the dealers have sufficiently alleged predicate acts of mail and wire fraud in support of their § 1962(c) claim against Boch.

### 3. Standing

The RICO statute imposes a standing requirement under which a plaintiff seeking civil remedies for a violation of § 1962(c) must establish that the defendant's racketeering activities caused injury to the plaintiff's business or property.[16] See 18

---

[16] Section 1964(c) provides in relevant part that:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold

U.S.C. § 1964(c) (1994 & Supp. II 1996); <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 495-97 (1995); <u>Camelio v. American Fed'n</u>, 137 F.3d 666, 669-70 (1st Cir. 1998).  More particularly, a plaintiff's standing to sue depends on a finding that at least one of the defendant's predicate acts of racketeering was the proximate cause, as well as the but-for or factual cause, of the plaintiff's injury.  <u>See</u> <u>Holmes v. Securities Investor Protection Corp.</u>, 503 U.S. 258, 268, 276 (1992); <u>Camelio</u>, 137 F.3d at 670. At the pleading stage, however, general factual allegations that the plaintiff suffered injury as a result of the defendant's conduct are sufficient to satisfy the standing requirement.  <u>See</u> <u>National Org. for Women, Inc. v. Scheidler</u>, 510 U.S. 249, 256 (1994).

The dealers claim that they relied on the fraudulent misrepresentations that Boch caused SNE to make about the vehicle allocation system when they decided to enter into dealership

----

the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C. § 1964(c).

-36-

agreements.[17]  See First Am. Compl. (Doc. #31) ¶ 90 at 27.  They allege that because they were deceived as to the nature of the allocation system, they were compelled to purchase "option-packed" vehicles that were harder to sell and less profitable. See id. ¶ 107 at 35.  The net result, according to the dealers, is that the fraudulent "option-packing scheme," implemented and advanced by Boch's violations of the mail and wire fraud statutes, caused the dealers to suffer lost profits and a diminishment in the value of their dealerships.  See id. ¶ 108 at 35.

Based on these allegations, I conclude that the dealers have pleaded sufficient facts to establish the causal connection required for standing.  The complaint, read in the light most

_____

[17]  Because the dealers have alleged actual and detrimental reliance on the alleged misrepresentations, see First Am. Compl. (Doc. #31) ¶90 at 27, I need not consider whether a failure to do so would prevent them from asserting standing.  See Sebago, Inc. v. Beazer East, Inc., 18 F. Supp.2d 70, 81-82 (D. Mass. 1998) (citing and discussing cases disagreeing on whether actual and detrimental reliance on alleged misrepresentations is required for standing to sue for a violation of § 1962(c) based on predicate acts of mail/wire fraud).

favorable to the dealers, alleges that the dealers' property and/or businesses were injured, and that Boch's racketeering activities were both the proximate and factual cause of those injuries.  Nothing more is required at this stage of the litigation.

For the reasons stated above, I conclude that the dealers have sufficiently alleged that Boch conducted or participated in the conduct of SNE through a pattern of mail and/or wire fraud, and that the mail and/or wire fraud caused injury to the dealers' property and/or businesses.  Accordingly, Boch's motion to dismiss Count III is denied.

## IV.

For the reasons set forth herein, I grant defendants' motion to dismiss Counts I and II and the portion of Count III that depends upon the pleading of Hobbs Act violations as predicate

acts of racketeering.  I deny the motion to dismiss insofar as it applies to the remainder of Count III.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

January 13, 2000

cc:  Richard McNamara, Esq.
     Michael Harvell, Esq.
     Howard Cooper, Esq.
     William Kershaw, Esq.
     Robert Cordy, Esq.