Lussier v. Subaru of N.E.                CV-99-109-B    10/16/00

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>George Lussier Enterprises, Inc.</u>
<u>d/b/a Lussier Subaru, et al.</u>

   v.                                    Civil No.  99-109-B
                                        Opinion No. 2000 DNH 220
<u>Subaru of New England, Inc., et al.</u>


<u>**MEMORANDUM AND ORDER**</u>


George Lussier Enterprises, Inc. and six other present and former New England Subaru dealers commenced this class action against Subaru of New England, Inc. ("SNE") and its sole shareholder, Ernest Boch, in March 1999. The dealers allege that SNE and Boch have engaged in an "option-packing scheme," by which they used their power to allocate or withhold certain desirable vehicles to coerce the dealers to purchase unwanted accessories. The dealers claim that this practice breaches their dealer contracts and violates federal antitrust laws, the federal RICO

statute, and various state dealer protection statutes.[1]

In this Memorandum and Order, I address plaintiffs' request that the defendants be preliminarily enjoined from proceeding with what plaintiffs contend is a campaign to retaliate against class members who support this litigation.

## I. BACKGROUND

Plaintiffs base their retaliation claim primarily on circumstantial evidence. They ask me to infer that SNE has embarked on a campaign of retaliation from the fact that SNE has initiated termination proceedings against three dealers who are

---

[1] The dealers' factual allegations and legal claims are described in detail in two previous orders. See George Lussier Enters., Inc. v. Subaru of New England, Inc., Civil No. C-99-109-B, 1999 WL 1327396 (D.N.H. Dec. 13, 1999) (denying motion to dismiss dealers' antitrust claim against SNE); George Lussier Enters., Inc. v. Subaru of New England, Inc., Civil No. C-99-109-B, Opinion No. 2000 DNH 013, 2000 WL 1466132 (D.N.H. Jan. 13, 2000) (granting motion to dismiss dealers' RICO claims against SNE; granting in part and denying in part motion to dismiss dealers' RICO claim against Boch). The plaintiffs recently filed a Second Amended Complaint asserting additional claims and naming an additional defendant. See Doc. No. 147.

closely associated with this litigation. They have also produced evidence suggesting that Boch and SNE's senior employees are angry with dealers who have supported the litigation and have attempted to persuade them to abandon the lawsuit. Finally, plaintiffs have produced a witness who claims that a senior SNE employee told him that "Boch will get everyone who goes against him, including the plaintiffs in this lawsuit, one by one, just like he did in the prior litigation." Aff. of Brian Swanson, Pls.' Ex. 1 at 3. I discuss this evidence in greater detail in the sections that follow.

## A.   Subaru of Wakefield

SNE asserts that it attempted to terminate Subaru of Wakefield because: (i) it kept a sales log containing racist, sexist, and homophobic comments about potential customers; (ii) it violated its agreement with SNE to use SNE's "Data Communications System" ("DCS") only for its internal data processing needs; and (iii) it breached its agreement not to involve a Wakefield employee who had previously been implicated

in a warranty fraud scheme in further warranty work.[2]

   1.   The Sales Log

Shortly before SNE instituted termination proceedings against Wakefield in October 1999, it discovered that one of Wakefield's senior managers maintained a sales log containing racist, sexist, and homophobic comments concerning potential customers who had visited the dealership.  These comments were made over an extended time period and included statements such as "nigger with a wet dream," "Chinese major piece of shit," "fucking cunt," "Hebrew looking for pennies under the seat," and "Queer Jew."  Ex. 5 to Lustbader Aff.[3]  When SNE informed Wakefield's president, Richard Kalika, of the log, he responded with a letter stating that "I have reviewed . . . [the]

---

   [2]  Wakefield was a named plaintiff in this action.  However, it settled its claims with the defendants and I recently granted its motion to dismiss its individual claims.  See Motion of Plaintiff Subaru of Wakefield, Inc. to Dismiss Its Claims With Prejudice (Doc. No. 141).

   [3]  "Lustbader Aff." refers to the Affidavit of Philip L. Lustbader, Defendants' Exhibit Number One.

log as you have suggested and I am dealing with this internal matter appropriately. Wakefield's excellent customer satisfaction record speaks for itself, and belies any theory that Wakefield does not maintain superior relations with its customers." Letter from Kalika to Lustbader of 8/26/1999, Pls.' Ex. 13. Kalika also notified SNE after it initiated termination proceedings that he had warned the employees who had produced the log that they would be discharged if they engaged in similar conduct in the future. See Transcript of October 15, 1999 Meeting Between Kalika and Lustbader, Pls.' Ex. 14 at 56.

Defendants claim that Wakefield's maintenance of the sales log violates paragraph 4.1 of its Dealership Agreement with SNE. Paragraph 4.1 provides that

> [a] Dealer shall safeguard and promote the reputation of Subaru Products and of Fuji, SOA [Subaru of America], Distributor and all other Subaru distributors and dealers. Dealer shall refrain from all conduct which might be harmful to such reputations or to the marketing of Subaru Products or which might be inconsistent with the public interest. Dealer shall avoid illegal, deceptive, misleading or unethical practices.

Defs.' Ex. 24 at 3. Defendants also invoke Paragraph 15.1.12 of the Agreement which authorizes SNE to terminate a dealer due to the "[d]ealer's abuse, misuse, discrediting or otherwise impairing the name or reputation of Fuji, SOA, Distributor, or any other Subaru distributor or dealer, or of any Marks or of any Subaru Products."

Plaintiffs concede that the sales log contains inappropriate comments, but contend that termination is unwarranted because: (i) the owner of the dealership did not know of the comments until after SNE discovered them; (ii) Wakefield's customers were not permitted to see the sales log; and (iii) after SNE began termination proceedings, Wakefield warned the employees who had produced the log that their conduct was unacceptable.

2. <u>Dealer Communication System</u>

The DCS is a computerized database of sales information for Subaru's fifty-seven New England dealers. Aff. of Howard F. Eddy, Ex. 26 to Lustbader Aff., at 1. Each dealership has access to the database through a computer terminal located in the

dealership.  However, SNE's vice president of data processing testified that

> [t]he DCS software is designed to allow a dealer to access only its own sales information.  The software contains filters which prevent a dealer from accessing its competitors' information.  The filters which are in place must be bypassed <u>intentionally</u> in order for one dealer to obtain a competitor's data.  (The exception to this is in the ability of all dealers to use the system to access by Vehicle Identification Number information regarding a particular vehicle on an occasion when they are asked by a customer to service a vehicle they did not sell.  Such access, however, is permissible solely for the car being serviced as part of the non-selling dealer's internal data processing needs, <u>i.e.</u>, so the non-selling dealer can confirm warranty recall and some service information).  The accessing of a competitor's data for any purpose, let alone for litigation purposes, is not part of any dealership's internal processing needs.

<u>Id.</u> at 3.  Wakefield's use of the DCS is limited by the terms of a Dealer Communication System Agreement between SNE and its dealers.  <u>See</u> Dealer Communication System Agreement, Defs.' Ex. 32.  This agreement provides in pertinent part that

> SNE hereby grants to Dealer a personal, non-

transferable and non-exclusive license to access NEDIS [New England Dealer Information System] only from the Dealer's Site and only to satisfy Dealer's internal data processing requirements.

Id. at 3.

SNE proposed to locate a Subaru dealership in Danvers, Massachusetts in mid-1996. Wakefield protested SNE's decision by filing suit in state court. See Lustbader Aff. at 13. During the course of the state court litigation, Wakefield repeatedly attempted to obtain sales information for the Danvers dealership from SNE. These efforts culminated in an order from the Massachusetts Appeals Court rejecting Wakefield's attempt to obtain the sales data and concluding that the data was "confidential and proprietary." See Ex. 23 to Lustbader Aff. Wakefield nevertheless obtained some of the data from the DCS. See Dep. of Kalika, Ex. 24 to Lustbader Aff., at 94-95. It then used the information in its litigation against SNE. See id.; Aff. of Kalika, Pls.' Ex. 4 (hereinafter "Kalika Aff.").

Defendants contend that SNE has good cause to terminate Wakefield because it violated the DCS agreement. Wakefield responds by claiming that it did not violate the agreement because: (1) any dealer could have obtained the information from the DCS; (2) SNE did not treat the sales data as confidential or proprietary; (3) Wakefield used the sales data only for its internal data processing requirements; and (4) SNE knew that Wakefield was accessing the sales data and did not object. See Kalika Aff.

3. Larry Olanyk

SNE determined in 1996 that Wakefield's sales manager, Larry Olanyk, had committed warranty fraud by submitting $91,000 in false service invoices to Subaru of America. This fraud was later described in an order issued by a Massachusetts judge in connection with litigation between SNE and Wakefield. See Subaru of New England, Inc. v. Subaru of Wakefield, Inc., Memorandum of Decision and Order for Judgment, Sept. 24, 1999, Ex. 2 to Lustbader Aff., at 6. Wakefield fired Olanyk but later re-hired

him after giving SNE assurances that it would not permit him to oversee any further warranty work. See Lustbader Aff. at 18; Dep. of Scott Scimemi, Ex. 32 to Lustbader Aff., at 174. Notwithstanding its assurances, Wakefield allowed Olanyk to become involved in warranty work on a temporary basis while the person who was hired to perform that work "got up to speed." See Letter from Kalika to Lustbader of 08/26/1999, Pls.' Ex. 13. SNE learned that Wakefield had violated its agreement not to allow Olanyk to perform warranty work shortly before it instituted termination proceedings against Wakefield.

SNE claims that it is justified in terminating Wakefield because the dealership violated its agreement with SNE that it would not permit Olanyk to perform warranty work. Plaintiffs challenge this contention by claiming that (1) none of Wakefield's principals were involved in the underlying fraud; (2) SNE agreed that Wakefield could re-hire Olanyk; and (3) Olanyk performed the warranty work only for a short time after he was re-hired.

## B.  Tri-State Subaru

SNE claims that it is entitled to terminate Tri-State Subaru, Inc. ("Tri-State") because Tri-State committed fraud during a "Butting Heads" sales contest sponsored by SNE.[4]  Under the rules of the Butting Heads sales contest, Tri-State was matched with another dealership in a contest to sell or lease a designated number of vehicles during a one-month period in June 1999.  Tri-State earned the contest's $10,000 award by reporting that it has sold or leased its target of forty-one vehicles during the contest period.

Two of the vehicles that Tri-State claimed it had leased during the contest had in fact been leased from a Toyota Lincoln Mercury dealership owned by Tri-State's owner, Peter Krause.  <u>See</u> Lustbader Aff. at 21; Tr. at 31[5].  These two vehicles were in

<hr/>

[4]  Tri-State is not a named plaintiff.  However, its owner has been a vocal supporter of this litigation.

[5]  "Tr." refers to the transcript of the preliminary injunction hearing held before Magistrate Judge Muirhead on January 7, 2000.  (Doc. No. 70).

inventory at another Krause-owned dealership, Suburban Subaru, and were delivered to the customer directly. See Tr. at 29-32; Letter from Krause to Boch of 9/24/1999, Pls.' Ex. 38. The paperwork for both leases was completed and signed by employees at Suburban Subaru and both leases identified Suburban Subaru as the lessor. See Tr. at 59-60; Letter from Vincent Fieseler to Lustbader of 10/14/1999, Defs.' Ex. 76 (hereinafter "Fieseler Letter"). The proceeds of both leases were paid to Suburban Subaru by the leasing company shortly after the leases were executed. See Tr. at 60; Fieseler Letter.

SNE audited Tri-State and the winners of other Butting Heads contests in early August 1999. During the audit process, SNE contacted the leasing company that had funded the leases for the two vehicles and learned that the proceeds from both leases had been paid to Suburban Subaru rather than Tri-State. See Fieseler Letter; Letter from Lustbader to Jeffrey Levine, Esq. of 9/30/1999, Defs.' Ex. 74. On August 19, 1999, SNE's vice president for operations, Philip Lustbader, wrote to Krause and

requested copies of the leases for both vehicles.  See Letter from Lustbader to Krause of 8/19/1999, Defs.' Ex. 64.  Rather than produce the original leases naming Suburban Subaru as the lessor, Krause caused new leases to be prepared identifying Tri-State as the lessor for both vehicles.  See Letter from Krause to Lustbader of 8/31/1999, Defs.' Ex. 65.  These leases were typewritten and signed but were left undated.  Krause sent copies of the new leases to Lustbader without referencing the original Suburban Subaru leases.  See id.  At approximately the same time, Krause also sent the new leases to the leasing company with instructions to "flat cancel" the old leases and re-book them in Tri-State's name.  See Letter from Chase to Lustbader of 11/23/1999, Defs.' Ex. 80.  The leasing company could not accommodate Tri-State's request because the period within which such cancellations were permitted had expired.  See id.  Krause then caused a third set of leases to be prepared and submitted to the leasing company with instructions to re-book the leases in Tri-State's name.  The new leases are handwritten, signed, and

bear a June 23, 1999 signature date, even though they were not prepared until late August or early September. <u>See</u> Fieseler Letter; Tr. at 34.

Lustbader informed Krause of the fact that he knew that the vehicles had originally been leased by Suburban Subaru in a letter dated September 20, 1999. <u>See</u> Letter from Lustbader to Krause of 09/20/1999, Defs.' Ex. 67. On September 24, 1999, Krause wrote to Boch and offered the following explanation for his actions:

> A salesperson at our Toyota-Lincoln-Mercury dealership in Northampton, Ma. has sold the Home Stores approximately eight vehicles. This company asked to lease two Subarus. Suburban Subaru had the cars in stock. The cars were leased through [the leasing company] and physically delivered to the Home Store in Northampton. Considering these vehicles were an off-site sale, and I own both dealerships, I, as Dealer Principal, elected to report the leases through Tri-State Subaru. The records at [the leasing company] reflect this event. Your personnel have spoken with the owner of the vehicles and they were sold and registered within the time frame of the contest, and in accordance with Subaru of America's Sales Reporting Rules.

Letter from Krause to Boch of 9/24/1999, Pls.' Ex. 38 at 2.

SNE sent Tri-State a termination notice on October 14, 1999, alleging that Tri-State had committed fraud during the Butting Heads sales contest. See Letter from Lustbader to Krause of 10/14/1999, Defs.' Ex. 77. In response, Krause provided the following explanation for his actions:

> Subaru of New England arbitrarily entered Tri-State Subaru into a Butting Heads contest against Patricks Subaru. It was a race to an objective set by SNE. As the month came to an end, it was determined that Tri-State had an opportunity to make their objective, and Patricks could not. The Home Store deals were thus RDR'd by Tri-State. I again reiterate that these transactions belonged to no specific dealership and were legitimately reported by Tri-State Subaru. The paperwork was adjusted to reflect the same. The customer and the bank were aware and accepted the transactions. In no way were either harmed. There was no fraud.
>
> The original Tri-State contracts contained an error, needed to be resigned and resubmitted. Your conversations with the customer demonstrates that no wrongdoing has been done by Tri-State Subaru.

> The information you received from Chase
> Automotive Finance was, as you already know,
> inaccurate and a copy of Vincent Fieseler's
> letter is attached. These transactions were
> fully funded to Tri-State Subaru and for
> several months Tri-State has been the
> dealer of record.

See Letter from Krause to Lustbader of 11/1/1999, Defs.' Ex. 78.

## C.  <u>**Bald Hill Subaru**</u>

Bald Hill Subaru has been an authorized Subaru dealer for more than ten years.  The company signed dealership agreements in 1989, 1993, and 1996, in which it represented that Robert Petrarca owned 50% of the dealership's stock and the remaining 50% was evenly split between Robert and Ann Hagan.  <u>See</u> Defs.' Exs. 96-98.  Notwithstanding these representations, Petrarca and the Hagans began in the late 1980s to transfer their stock to members of their respective families.  <u>See</u> Letter from Joshua Teverow, Esq. to William O'Gara, Esq. of 5/19/1999, Ex. 47 to Lustbader Aff.  By 1999, these transfers had resulted in the following ownership structure for the company:  Robert Hagan, 1.8%; Anna Hagan, 10.3%; Anna Hagan Webb, 8.6%; Carol Hagan

McEntee, 8.6%; James Hagan, 12%; Amy Hagan, 8.6%; Robert Petrarca, Sr., 24%; Robert Petrarca, Jr., 8%; Debra Petrarca Smith, 6.5%; Karen Petrarca, 5%; and Mia Petrarca, 6.5%. See id. Bald Hill failed to disclose these changes in ownership until SNE learned of them during a deposition of Robert Petrarca in connection with other litigation between SNE and Bald Hill on May 17, 1999. See Lustbader Aff. at 31.

Bald Hill's dealership agreement contains an acknowledgment stating that SNE had entered into the agreement in reliance upon Bald Hill's representations concerning the ownership of the dealership. See Defs.' Ex. 98 at ¶ 5. It also contains a provision providing that Bald Hill may not make any changes in the ownership of the dealership without SNE's prior written consent. See id. at ¶ 6. Finally, the dealership agreement authorizes SNE to terminate Bald Hill if it makes

> Any change in the percentage of beneficial
> ownership of Dealer, or any transfer of any
> rights or obligations under the Agreement or
> a Significant Change of Ownership interest in
> either case, whether voluntary, involuntary
> or by operation of law, without the prior

> written consent of Distributor and, if
> required by Paragraph 14 of the Agreement, of
> SOA.

See Defs.' Ex. 99 at ¶ 15.1.5. The agreement defines a significant change of ownership to include "the admission of a new partner or shareholder in Dealer." Id. at ¶ 2.11.

SNE argues that it is entitled to terminate Bald Hill because the dealership repeatedly misrepresented its ownership structure and made numerous significant changes in the ownership of the business without SNE's prior written consent. See Letter from Lustbader to Petrarca of 6/25/1999, Ex. 45 to Lustbader Aff. Plaintiffs respond by claiming that SNE's actions are unlawful because: (1) Bald Hill's misrepresentations and failures to obtain consent were inadvertent, good faith mistakes; (2) all of the stock transfers were made to members of the Petrarca and Hagan families; and (3) its misrepresentations and failures to obtain consent were of no consequence because Rhode Island law does not permit a distributor such as SNE to withhold consent to the kind of ownership changes that have occurred in this case.

-18-

## D.    Defendants' Statements

Several witnesses testified that Boch and other officials at SNE made statements reflecting their anger toward the dealers who had become involved in their lawsuit.  Krause testified that he had a conversation with Boch in which he was accused of being a "ringleader and a back stabber" because he had contributed to a fund for the lawsuit.  See Tr. at 21.  Krause also described a second heated conversation with Boch in which Boch questioned him about the lawsuit and asked him to "get out" of it.  See id. at 22-23.  Robert Petrarca testified when he attempted to speak to a senior SNE employee about changes in ownership that had occurred at his dealership, the employee responded that "they were busy with other things such as motions to dismiss."  See id. at 114. The employee also told Petrarca that Boch was "surprised" and "hurt" that the Petrarca family had been involved in the lawsuit. See id. at 114-115.  Finally, Walter Heingartner, another dealer, testified that the same employee attempted to arrange a meeting between Heingartner and Boch and that the employee was

"extraordinarily shocked that I was a lead plaintiff in this particular action." See id. at 146.

Plaintiffs also produced testimony from Brian Swanson, who testified that his friend, Joseph Appelbe, a vice president for SNE, had told him that: (1) there would be no evidence to support the plaintiffs' claims because "its gone"; (2) Boch had offered Appelbe an additional $50,000 to remain with SNE after the lawsuit was filed and Appelbe had submitted a letter of resignation; (3) Appelbe had been keeping a book that was worth one to two million dollars to Boch; (4) Appelbe and others had once opened a bottle of champagne to celebrate the fact that SNE had successfully terminated a dealer who had opposed them in other litigation; and (5) Appelbe believed that Boch "will get everyone who goes against him, including the plaintiffs in this lawsuit, one by one just like he did in the prior litigation." See Tr. at 160-64; Aff. of Brian Swanson, Pls.' Ex. 1, at 3.

Appelbe characterizes the comments that Swanson attributes to him somewhat differently. He denies that he ever said or

implied that documents relevant to the litigation had been destroyed. He denies saying anything to Swanson that would justify an inference that his continued employment with SNE was somehow tied to the litigation, and he denies ever telling Swanson that Boch would retaliate against anyone who challenged him. See Aff. of Joseph Appelbe, Pls.' Ex. 52; Tr. at 184-210.

## II. THE PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, a plaintiff ordinarily must demonstrate that: "(1) it is substantially likely to succeed on the merits of its claim; (2) absent the injunction there is significant risk of irreparable harm; (3) the balance of hardship weighs in its favor; and (4) the injunction will not harm the public interest." Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999) (internal quotations and citations omitted).

The plaintiffs have not attempted to demonstrate that they will succeed on the merits of their option-packing claims. Instead, they base their request for injunctive relief on the

premise that they will be entitled to a preliminary injunction if they can establish that defendants have embarked on a plan to retaliate against dealers who have expressed support for this lawsuit.[6]  I accept this premise for purposes of analysis.[7]

---

[6]  Plaintiffs argue that I have the power to issue a preliminary injunction under the All Writs Act, 28 U.S.C. 1651 (2000), because the relief they seek is "necessary or appropriate" to the court's jurisdiction.  They also claim that preliminary injunctive relief is warranted pursuant to Fed. R. Civ. P. 23(d) because an injunction is necessary to protect the absent class members.  I have previously determined that the Anti-Injunction Act, 28 U.S.C. 2283 (2000), prevents me from enjoining ongoing state court termination proceedings.  See Memorandum and Order dated April 17, 2000 (Doc. No. 102), Opinion No. 2000 DNH 092.  In this Memorandum and Order, I assume for purposes of analysis that I have the power to prevent the defendants from instituting termination proceedings against additional dealers if the evidence demonstrates that they have engaged in a pattern of retaliatory conduct.

[7]  The Magistrate Judge held an evidentiary hearing on plaintiffs' request for a preliminary injunction and issued a report recommending that I issue the requested injunction.  See Report and Recommendation (Doc. No. 80).  Although I have carefully considered the Magistrate Judge's helpful report, I must make a de novo determination of the facts and reach my own decision on the merits without deference to his findings and recommendations.  See 28 U.S.C. § 636(b)(1) (2000).

## III.  **ANALYSIS**

Plaintiffs' preliminary injunction motion depends upon their contention that SNE's attempted terminations of Wakefield, Tri-State, and Bald Hill are baseless and that the timing of the terminations suggests that they are retaliatory.  I reject plaintiffs' motion because they have failed to prove either contention.

SNE has established that Wakefield's senior management followed a regular practice of making racist, sexist, and homophobic comments about potential customers in the dealership's sales log.  Although no customers ever saw the log and there is no evidence that Wakefield's owners were aware of this practice until after it was uncovered by SNE, it is undisputed that the comments are extreme, that they appear throughout the log, and that they were made with the knowledge of Wakefield's senior managers.  SNE has a compelling interest in avoiding any perception that its dealerships are staffed by racists, sexists, and homophobes.  Under the circumstances presented in this case,

it therefore had a reasonable basis for concluding that the potential damage that could result from Wakefield's unacceptable conduct warranted the institution of termination proceedings against the dealership.[8]

The evidence supporting SNE's decision to terminate Tri-State is even more compelling. The record reveals that Krause masterminded a scheme to attribute two vehicle leases to Tri-State in order to win the Butting Heads contest even though Tri-State had nothing to do with either lease. The evidence further demonstrates that Krause attempted to conceal from SNE the fact that both vehicles originally had been leased by Suburban Subaru rather than Tri-State by submitting false leases to SNE and by causing false backdated leases to be prepared and submitted to the leasing company. While it may be true, as plaintiffs claim, that Krause had previously instructed his other dealerships to book Subaru sales through Tri-State rather than Suburban Subaru,

_____

[8] Because this ground alone justifies SNE's decision to institute termination proceedings against Wakefield, I need not address the other grounds identified in its termination notice.

-24-

the fact that his employees failed to follow his instructions does not justify his attempt to make it appear that the vehicles in question originally had been leased by Tri-State.  This evidence amply supports SNE's decision to terminate Tri-State.[9]

The evidence supporting SNE's decision to terminate Bald Hill is less dramatic than the evidence supporting the other two termination actions.  Although it is undisputed that Bald Hill

_____

[9]  SNE learned while auditing the winners of other Butting Heads sales contests that another dealership, Subaru of Wilton, had failed to comply with the rules of the contest by counting sales that had not been completed until after the competition had ended.  See Tr. at 92.  Rather than terminating the dealership involved, SNE took back the $10,000 award.  See id.  Plaintiffs argue that Subaru of Wilton was not treated as harshly as Tri-State because it was not involved in the litigation against SNE. I reject this argument because the two cases are distinguishable. Wilton's misconduct was committed by an employee of the dealership without the owner's knowledge.  See Tr. at 95. Moreover, when the misconduct was discovered, the owner of the dealership dealt with the matter forthrightly.  In contrast Krause concedes that he was responsible for the decision to include the leases for the two vehicles in the contest, and the evidence demonstrates that he attempted to conceal his conduct from SNE by submitting false leases in response to Lustbader's request and by causing leases submitted to the leasing company to be backdated to make it appear that they had been signed before the misconduct was discovered by SNE.

repeatedly breached its obligation under the dealership agreement to seek SNE's consent to changes in ownership in the dealership, and the dealership agreement provides that a failure to obtain consent to acting in ownership constitutes grounds for termination, it appears that Bald Hill's violations were both unintentional and nonprejudicial. Nevertheless, SNE's contract with Bald Hill gives it a contractual right to terminate the dealership for such violations and plaintiffs have not argued that this provision is unlawful. Under these circumstances, SNE was justified in instituting termination proceedings against Bald Hill after it learned that Bald Hill had breached its dealership agreement.

I am also unpersuaded by plaintiffs' claim that the timing of the terminations is suggestive of a retaliatory motivation. While it is true that SNE commenced each termination proceeding within seven months after plaintiffs filed their complaint, it is also true that SNE did not discover the information supporting the terminations until shortly before it commenced termination

-26-

proceedings against each dealership. Since, as I have already explained, SNE had a good faith basis for each of the terminations, I attach no significance to the fact that it commenced the termination proceedings after plaintiffs filed their complaint. Dealerships are not immune from termination for valid reasons merely because they have filed a complaint against a distributor.

Finally, I am not persuaded by plaintiffs' evidence concerning defendants' allegedly retaliatory mindset. It is unsurprising that Boch and SNE would be angry with business associates who have accused them of engaging in a criminal conspiracy. Merely showing that the defendants are angry or that Boch had asked several of the dealers not to support the litigation does not establish that he and SNE have embarked on a plan to retaliate against the plaintiffs. Finally, while Swanson's testimony concerning his conversations with Appelbe supports plaintiffs' retaliation claim, Appelbe denies the statements attributed to him and I cannot determine from the

present record whether Swanson or Appelbe is telling the truth. I do not discount the possibility that Boch and SNE might have conceived of a plan to harass or intimidate dealers who oppose them during this litigation. However, the present record does not demonstrate a likelihood that such a campaign of harassment and retaliation is under way. Accordingly, I deny plaintiffs' request for a preliminary injunction (doc. no. 43).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

October 16, 2000

cc:   Ronald Snow, Esq.
      Richard McNamara, Esq.
      Robert Cordy, Esq.
      Michael Harvell, Esq.
      William Kershaw, Esq.
      Howard Cooper, Esq.